PRESIDENT AND FELLOWS OF HARVARD COLLEGE *vs.*
ATTORNEY GENERAL & others.

Suffolk.    October 15, 1917. — November 27, 1917.

Present: BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Devise and Legacy.  Trust,* For promotion of applied science, Interpretation.

A testator by a deed of trust, incorporated in and confirmed by a codicil to his
will, provided that, after the payment of certain annuities, eighty per cent of
the net income of his estate should be accumulated until it amounted to one
million dollars and then should be transferred to the President and Fellows of
Harvard College, a corporation constituting Harvard University, that there-
after such eighty per cent should be paid over annually until the death of the
last annuitant, when the residue of the estate was to be paid over, estimated
as to be at that future time about twenty-three million dollars.  He provided
that the net income of the fund should be used to promote applied science in
the manner pointed out by the instrument, and an intention was manifested
that not only the investment of the fund but also the education which the
fund made possible should be under the control and direction of the univer-
sity and should be admininistered by it.  He provided that, if Harvard
University failed to accept the trust, it should go to a new Massachusetts cor-
poration to be organized by the trustees which should receive and apply the en-
dowment "for the purposes and upon the terms above set forth in respect to
said gift to Harvard College."  Harvard University accepted the trust and
undertook to make with the Massachusetts Institute of Technology, here called
the institute, an agreement whereby three fifths of the income of the endow-
ment fund were to be devoted to an engineering school which should be
carried on at the institute and be controlled and conducted by the institute,
vesting practically in the institute the substantial organization, control, direc-
tion and administration of the work to be done under the agreement.  Upon
a bill in equity filed by the President and Fellows of Harvard College for in-
structions, it was *held,* that the proposed agreement was not authorized by
the terms of the trust and could not be carried out lawfully by means of the
funds received under the deed of trust and the codicil in question.

BILL IN EQUITY, filed in the Supreme Judicial Court on May
28, 1915, and amended on November 21, 1916, by the President
and Fellows of Harvard College, a corporation, for instructions
as to whether the plaintiff lawfully might carry out a certain
agreement between the plaintiff and the Massachusetts Institute
of Technology, a corporation, which was approved finally and
went into effect on March 1, 1915, so far as respected the property

received by the plaintiff under the deeds of trust and the will of Gordon McKay, who died, resident at Newport in the State of Rhode Island, on October 19, 1903.

The will of Gordon McKay was dated December 1, 1887. By a second codicil dated November 5, 1891, the testator confirmed a deed of trust dated October 30, 1891, recited in that codicil as follows:

"I, Gordon McKay of Newport, in the State of Rhode Island, in exercise of the powers reserved by me in a certain Instrument dated November 30th, A. D. 1887, conveying certain property in trust to Frank F. Stanley, Trustee, and in a certain supplementary Instrument of Trust dated January 30th, A. D. 1891, the two forming one instrument, do hereby direct and provide as follows:

"I appoint William Minot, Junior, of Boston, in the County of Suffolk and Commonwealth of Massachusetts, Counsellor-at-law, to be one of the Trustees under said Instrument, of which this instrument is also a part, to act after my decease in place of Elias Merwin, deceased.

"The house which my Trustees are directed to provide for Marion McKay is already provided, and now stands in the name of said Stanley as Trustee.

"I revoke all the provisions for the accumulation of three hundred thousand dollars, and the use of a certain estate number twenty-four Arrow Street (which I have sold) for the purpose of establishing and maintaining a home for deserving indigent females. I direct that said sum of Three hundred thousand dollars shall not be accumulated for that purpose, but shall form part of the accumulation to be applied as an endowment for a School of Art as hereinafter provided.

"I revoke all the provisions in said Trust Instrument for the accumulation of income to establish, and for the endowment, maintenance, government and regulation of a School of Art, and I substitute therefore the following provisions.

"I direct that eighty per cent of the balance of said net annual income after paying the annuities (the remaining twenty per cent being held as a reserved fund to cover any future possible deficiency in the annual income to pay said annuities) shall be safely invested by my trustees from time to time until such accumulations amount to the sum of one million dollars and then

I direct my trustees to pay over said sum of one million dollars to 'the President and Fellows of Harvard College in their corporate capacity,' if said Corporation shall accept the same for the purposes and upon the terms and conditions hereinafter set forth: to be held and applied by them and their successors in said capacity for the purposes and trusts hereinafter declared.

"I also direct said trustees to pay to the said President and Fellows (if and after said sum of one million dollars has been paid over to them as aforesaid) annually eighty per cent of the balance of the net income accruing from the remainder of my estate after paying the existing annuities and upon and after the death of the last surviving annuitant, I direct said Trustees to pay over to the said President and Fellows of Harvard College all the residue of my estate including all unexpended income, all of which said sums, I give to the said President and Fellows of Harvard College, provided they accept the same as aforesaid strictly upon the trusts and for the purposes following, namely:

"I direct, if the said Corporation, the President and Fellows of Harvard College accept said gift, that the sum total of all the property and moneys conveyed by my trustees to the President and Fellows of Harvard College, shall be forever known and described in the records of the President and Fellows and on the books of their Treasurer as the Gordon McKay Endowment.

"I give the President and Fellows full powers to hold, manage and protect, improve, sell, invest and re-invest at their discretion from time to time the property in which this Endowment may at any time be invested: I also give the said Corporation authority, in case the principal shall be at any time impaired through misfortune, to accumulate the income of the Endowment, or any part thereof, until the principal shall be made good: but in order that the principal and income may share in the guaranty or insurance which is derived from the large mass and wide distribution of the University's investments, I prefer that the investments of the Endowment be merged, as soon and as far as in the discretion of the President and Fellows they prudently and equitably may be, with the general investments of the other permanent funds held by the President and Fellows.

"The net income of said Endowment shall be used to promote applied science:

"*First.*   By maintaining professorships, workshops, labora-
tories and collections for any or all of those scientific subjects,
which have, or may hereafter have, applications useful to man and

"*Second.*   By aiding meritorious and needy students in pursu-
ing those subjects.

"Inasmuch as a large part of my life has been devoted to the
study and invention of machinery, I instruct the President and
Fellows to take special care that the great subject of mechanical
engineering in all its branches and in the most comprehensive
sense, be thoroughly provided for from my Endowment.

"I direct that the President and Fellows be free to provide from
the Endowment all grades of instruction in applied science, from
the lowest to the highest, and that the instruction provided be
kept accessible to pupils who have had no other opportunities
of previous education than those which the free public schools
afford.

"I direct that the salaries attached to the professorships main-
tained from the Endowment be kept liberal, generation after
generation, according to the standards of each successive genera-
tion, to the end that these professorships may always be attractive
to able men and that their effect may be to raise, in some judicious
measure, the general scale of compensation for the teachers of
the University.

"I direct that the professors supported from this Endowment
be provided with suitable assistance in their several departments
by the appointment of instructors of lower grades, and of draughts-
men, foremen, mechanics, clerks or assistants, as occasion may
require, my desire being that the professors be free to devote
themselves to whatever part of the teaching requires the greatest
skill and largest experience, and to the advancement of their
several subjects.

"I direct that the President and Fellows be free to erect build-
ings for the purposes of this Endowment, and to purchase sites
for the same, but only from the income of the Endowment.

"I direct that all the equipment required to illustrate teaching
or to give students opportunity to practice, whether instruments,
diagrams, tools, machines or apparatus, be always kept of the best
design and quality, so that no antiquated, superseded, or un-
serviceable implement or machinery shall ever be retained in the

lecture rooms, workshops or laboratories maintained from the Endowment.

"Finally, I request that the name Gordon McKay be permanently attached to the professorships, buildings, and scholarships or other aids for needy students, which may be established, erected or maintained from the income of this Endowment.

"Should the said President and Fellows of Harvard College fail to accept (in writing) the above Endowment upon the terms and provisions above set forth within two years after my death, I then give said accumulations and said residue to my trustees hereunder and their successors, in trust to apply the same to the purposes above set forth.

"And for this purpose I direct them to select suitable associates and form a corporation in, and under the laws of, and if need be under a special charter to be obtained from the legislature of the Commonwealth of Massachusetts, to receive, hold, manage and apply said Endowment by means of an establishment at some place within said Commonwealth for the purposes and upon the terms above set forth in respect to said gift to Harvard College.

"In further trust to transfer to said Corporation when formed the said accumulations and residue in the manner and at the times above prescribed for the payment thereof to the President and Fellows of Harvard College.

"In further trust, to the end that said fund shall be applied according to my intention, in case of any insuperable difficulty by reason of any change, in time to come in the laws of the said Commonwealth or otherwise in forming such a corporation, then to dispose of the same as a public charity by transfer to some existing corporation or otherwise, in such manner as under the consideration and order of the Supreme Court of Massachusetts shall effect or most nearly effect my above declared intention and purpose.

"I direct my Trustees hereunder to provide for the proper care and maintenance of the McKay burial place in the Pittsfield Cemetery in Massachusetts, and of the tomb now there or which I may hereafter erect or substitute, and I charge the ultimate recipient of the fund hereunder with the care and maintenance of the same from the time of the first transfer to it forever.

"In witness whereof, I hereunto set my hand and seal on this thirtieth day of October, A. D., 1891.        Gordon McKay."

On October 31, 1904, the President and Fellows of Harvard College accepted the trust by the following vote:

"Voted, Whereas Gordon McKay of Newport in the State of Rhode Island in his lifetime executed certain instruments of trust, and also executed a will and codicils, in which will and codicils were contained copies of said instruments and by which will and codicils said instruments were confirmed; and Whereas said Gordon McKay, subsequently deceased; and his said will and codicils have been duly proved and allowed; and Whereas said Gordon McKay, by said instruments of trust and said Will and codicils did give, devise and bequeath to and for the benefit of the President and Fellows of Harvard College, in their corporate capacity, certain sums and also the residue of his estate strictly upon the trusts, conditions and terms and for the purposes set forth and directed in said instruments, will and codicils:

"Now, Therefore, said President and Fellows of Harvard College, in their corporate capacity, on this thirty-first day of October, 1904, being within two years of the death of said Gordon McKay, do gratefully accept such gifts, devises and bequests strictly upon the trusts, conditions and terms and for the purposes in said instruments, will and codicils set forth and directed, to be held and applied by said President and Fellows, in their corporate capacity, and their successors in said capacity, for the said purposes and trusts."

The agreement between the plaintiff and the Massachusetts Institute of Technology, in regard to the validity of which instructions were sought, was as follows:

"In this agreement, 'the Institute' means the Massachusetts Institute of Technology, and 'the University' means Harvard University. It is understood that any action of the President and Fellows of Harvard College shall require the consent of the Board of Overseers wherever such consent is necessary under the laws governing the University.

"I. The University and the Institute shall be unaffected in name, organization, title to and rights over property, except that

the University is hereby given whatever rights and interests are necessary to secure to the students of the University the educational opportunities and advantages meant to be acquired for their benefit under the operation of this agreement. For the purpose of keeping in touch with the actual operations of the School the President of the University may from time to time visit the School, examine the plant, and familiarize himself with its methods and workings.

"II. The University and the Institute shall coöperate in the conduct of courses leading to degrees in Mechanical, Electrical, Civil and Sanitary Engineering, Mining and Metallurgy, and in the promotion of research in those branches of Applied Science. The courses and research shall be conducted in accordance with the provisions of this agreement and on the site in Cambridge recently acquired by the Institute bordering on Massachusetts Avenue and the Charles River Embankment or on any other site that may be agreed upon should future conditions render an extension or change of site desirable.

"III. Subject to the reservations hereinafter set forth the University shall devote to the purposes referred to in Section II the net income of all funds that are credited on its books to the Lawrence Scientific School; also the use of all machinery, instruments, and equipment that are suited to these purposes and that the University does not in its opinion need more urgently for other purposes; also not less than three-fifths of the net income of the Gordon McKay Endowment; also the income of all property that it may acquire hereafter for the promotion of education or research in the branches of Applied Science referred to in Section II; also such further sums as it may from time to time feel able to contribute.

"IV. Subject to the reservations hereinafter set forth, the Institute shall devote to the purposes referred to in Section II all funds, or the income of all funds, that it now holds or hereafter acquires for the promotion of education or research in the branches of Applied Science mentioned in that section, and in addition to this as much of the funds, or the income of funds, that it holds for general purposes as is not in its opinion more urgently required for other purposes.

"V. Students' fees for courses in the branches of Applied Science mentioned in Section II shall be devoted to the purposes

referred to in that section. These fees shall for the first ten years be deemed to be contributed by the two institutions in the proportion of the numbers of the students following these courses in the Institute and in the University's Graduate Schools of Applied Science, respectively, during the year 1913–14. At the end of ten years a different arrangement shall be made, if, in the opinion of the two Corporations, it appears to be more equitable. The fees of students pursuing courses in the subjects referred to in Section II in the University's Graduate Schools of Applied Science at the time when this agreement is adopted shall be unaffected by any change brought about by this agreement. For all other students the amount of the fees for complete courses leading to those degrees of the Institute and of the University that are granted through the operation of this agreement shall be $250 per annum until changed by agreement between the two Corporations. The amount of fees for partial courses and for research shall be determined as may be agreed upon from time to time.

"VI. The funds available for education and research in the branches of Applied Science referred to in Section II shall be expended through the Bursary of the Institute in the payment of salaries, the maintenance of scholarships, the care of grounds, and the erection and maintenance of buildings and equipment or otherwise as may be agreed upon from time to time, it being expressly provided that all proposed appropriations shall be approved by the Corporation that supplies the funds, and that buildings shall be erected only from the share of the funds supplied by the Institute.

"VII. All members of the Instructing Staff in the departments of Mechanical, Electrical, Civil and Sanitary Engineering, Mining and Metallurgy, who give instruction in courses leading to the degrees both of the University and of the Institute, shall be appointed and removed by the Corporation that pays their salaries after consultation with the other Corporation.

"VIII. All students registered at the Institute in the various numbered professional courses covered by Section II that lead to degrees of the University shall be eligible for those degrees, provided they satisfy the conditions prescribed by the University, and they shall be entitled to the same rights and privileges as students in the professional schools of the University.

"IX. The President or Acting President of the Institute shall be the executive head for all the work carried on under this agreement and for that purpose shall be the agent of the University as well as of the Institute and shall annually report to both Corporations. When any future President or Acting President is to be selected, the President or Acting President of the University shall be invited to sit with the committee that recommends the appointment of a President or Acting President to the Corporation of the Institute.

"X. As soon as this agreement goes into effect, the Faculty of the Institute shall be enlarged by the addition thereto of the professors, associate professors, and assistant professors of Mechanical, Electrical, Civil and Sanitary Engineering, Mining and Metallurgy, in the University's Schools of Applied Science. These persons shall acquire the titles and privileges of the same rank in the Institute while retaining their titles and privileges in Harvard University, and the terms and conditions of their employment and their salaries shall be unaffected by the change. The professors, associate professors, and assistant professors of the Institute in the departments of Mechanical, Electrical, Civil and Sanitary Engineering, Mining and Metallurgy, shall acquire the titles and privileges of the same rank in Harvard University while retaining their titles and privileges in the Institute, and the terms and conditions of their employment and their salaries shall be unaffected by the change. All professors, associate professors, and assistant professors appointed under the operation of Section VII shall have the titles and privileges of professors of the University and of the Institute, including the right to benefit from the pension systems of both institutions.

"Additions to the Faculty of the Institute shall be made by the appointment of professors, associate professors, or assistant professors under the operation of Section VII, or by the Corporation of the Institute for other purposes. The Faculty constituted as indicated above shall, subject to such directions as may be given by the Corporation of the Institute, prescribe the courses and conditions of entrance thereto leading to all degrees granted by the Institute. The same Faculty shall, subject to such directions as may be given by the Corporation of the University, prescribe the courses and conditions of entrance thereto leading to all de-

grees granted by the University under the operation of this agreement.

"XI. Degrees shall be conferred by the Institute and by the University acting separately on the recommendation of the Faculty referred to in Section X.

"XII. It is expressly provided that, as regards the funds and property of the University and of the Institute respectively referred to in Sections III and IV, this agreement shall be subject to any special terms and requirements upon which such funds and property may be held; and any property or funds that may be held at any time by either Corporation under such terms and restrictions as would prevent their use precisely as is indicated in this agreement, shall, nevertheless, be used by the two Corporations respectively for the support, benefit or encouragement of a coöperative effort in the field of education and research in engineering and mining in such manner as may be permissible or in accordance with the trusts upon which they may be held.

"XIII. Whereas, doubts might arise as to the legal effect of an omission from this agreement of any provision for its termination, it is hereby provided that the agreement may be terminated either by the University or by the Institute, but that no termination shall be made except upon notice from one party to the other of at least five years unless a shorter time be mutually agreed upon.

"XIV. This agreement shall take effect when finally adopted and approved by the Corporation and Board of Overseers of the University and the Corporation of the Institute; and the coöperation referred to in Section II shall begin when the Institute is ready to open courses in Engineering and Mining on the site in Cambridge mentioned in that Section."

The case was heard by *Pierce,* J., upon the pleadings, and the evidence submitted by the parties. With the consent of the parties the single justice reported the case with the evidence, the rulings thereon and all questions of law in the case for determination by the full court.

*C. F. Choate, Jr., (F. T. Field* with him,) for the plaintiff.

*J. G. Milburn* of New York, (*H. Wheeler, A. Marshall & H. E. Warner* with him,) for the trustees under the deed and will of Gordon McKay.

DE COURCY, J.  The question presented by this bill for instructions is whether the plaintiff corporation lawfully can carry out an agreement, duly made by it with the Massachusetts Institute of Technology, "as far as respects the property received by it under the deeds of trust and the will of Gordon McKay."

The agreement (above set forth in full) assumed its final form in February, 1915.  Speaking generally, it purports to establish a co-operative arrangement between Harvard University and the Institute "in the conduct of courses leading to degrees in Mechanical, Electrical, Civil and Sanitary Engineering, Mining and Metallurgy, and in the promotion of research in those branches of Applied Science."  To the maintenance of the plan the University agrees to devote, in addition to other income and equipment, "not less than three-fifths of the net income of the Gordon McKay Endowment."

On analyzing the material provisions of the plan, and considering them in their practical application, we are led to certain salient conclusions as to what the agreement accomplishes: Education and research in the five branches covered by the agreement are to be transferred from the University to the Institute, and there conducted under the provisions of the agreement as part of the latter's curriculum.  The Harvard professors associated with those courses shall become members of the faculty of the Institute, and the property and equipment which the University may hold for the promotion of instruction in industrial science shall be devoted to the courses as so conducted.  All students who take these engineering courses are to register at the Institute only, and pass under its jurisdiction.  It seems to us that they will become a part of its complete and distinct life, even though they are entitled to make use of the museums, libraries and playgrounds of the University, and to receive the degree of both institutions on completing any of the engineering courses.  The faculty which determines the conditions of entrance, prescribes the courses that lead to degrees, largely shapes and carries into practical application the instruction and discipline of the school, and mainly influences the appointment of professors, is the faculty of the Institute, notwithstanding that fourteen of its one hundred and twenty members come from the University.  The president of the Institute is made the executive

head of all the work carried on under the agreement. The amendment that he "for that purpose shall be the agent of the University as well as of the Institute" does not in fact enlarge the control of the University. The relation of the president of the Institute to the work is the relation of the Institute itself. Finally, the funds available for carrying out the plan are to be expended through the bursary of the Institute. And although "all proposed appropriations shall be approved by the Corporation that supplies the funds," that apparently leaves little real power in the University, as the total expenses of the school for any academic year are a fixed quantity, and the total contribution of the University is settled by the agreement. Considered as a whole, the plan appears practically to vest in the Institute the substantial organization, control, direction and administration of the work to be done under the agreement, and to commit to the Institute the money of the McKay endowment, and the work of planning and carrying out the engineering education provided thereby. In substance, it devotes three fifths of the income of the endowment to an engineering school, which is not only located at the Institute, but is conducted and controlled by the Institute instead of by the University. We cannot assent to the assertion of counsel that "the school of applied science on the Charles River embankment is a Harvard school, a department of Harvard University."

The Attorney General has not raised any question of *ultra vires*, and we assume that the University legally may use its general funds to carry out the agreement in question. There is no occasion here for the application of the *cy pres* doctrine because admittedly the trust can be administered. It may be assumed also that a co-operative plan like that proposed would be advantageous to both of these great institutions by creating one school of applied science of the highest efficiency, with economy in expenditure and effort, to take the place of two competitive schools. But so far as the agreement attempts to dispose of the income of the McKay gift, the controlling question is whether it is authorized by the terms and conditions of the trust upon which the gift was made and accepted. The income of the McKay endowment must be administered according to the intention of the founder, Gordon McKay, even though it be at variance with our views of policy or expediency. And that intention is to be gathered from the

trust instrument itself, read in the light of the attendant circumstances known to him, or reasonably presumed to have been contemplated by him at the time it was made. *Jackson* v. *Phillips*, 14 Allen, 539, 592. *Crapo* v. *Pierce*, 187 Mass. 141. *Crawford* v. *Nies*, 224 Mass. 474, 490.

The effective instrument is the deed of trust executed October 30, 1891, and confirmed by a codicil November 5, 1891. McKay was then seventy years of age. He had been a successful manufacturer and inventor of machinery. He was a man of artistic tastes, a lover of music, and had travelled extensively in Europe. From 1864 or 1865 for more than twenty years his home was in Cambridge, near the college yard; he took a leading part in supporting the Symphony concerts in Sanders Theatre, and was brought into friendly relations with many of the college teachers and students. He appreciated the advantage of combining training in the exact sciences with liberal culture in the atmosphere of the University. During all those years there was a close personal intimacy between him and the late Professor Shaler, long connected with the University, and appointed Dean of the Lawrence Scientific School in 1891; and with the latter McKay discussed his schemes for the disposition of his fortune. By his earlier trust deed of November 30, 1887, he gave $300,000 and his house in Cambridge to establish a home for deserving indigent females, and the residue of his estate to the University in trust for the establishment and maintenance of a separate school for instruction in the industrial arts and sciences, to be designated as the McKay School of Art; but these plans he abandoned in the deed of 1891. This later deed he never substantially changed during the remaining twelve years of his life, notwithstanding the negotiations of 1897–98 between the University and the Institute respecting a combined engineering school. He was familiar with the rapid development of the Lawrence Scientific School between 1891 and 1903 (the year of his death), and was accustomed to refer to it as "his school," when questioning Dean Shaler as to its condition.

In the light of this knowledge of McKay's personality and history we examine the effective deed of trust of October 30, 1891. He first provides the funds for the Gordon McKay Endowment. In brief, after the payment of certain annuities, eighty

per cent of the net income of his estate is to be accumulated until it amounts to one million dollars, and then transferred to the plaintiff.   Thereafter such eighty per cent is to be paid over annually until the death of the last annuitant, when the residue of the estate is to be paid.   In passing it may be said that the trustees of the McKay estate paid the one million dollars to the University in 1909, and have paid the subsequent annual income up to January 1, 1917, amounting to $1,247,261.12.   The income of these combined payments at four and a half per cent would be $101,126.75, and it will increase each year by reason of the annual payments to the University above mentioned.   According to the computations of the actuary the probable date of the death of the last survivor of the annuitants is January 1, 1956.   It is estimated that the capital of the endowment at that time will be $22,948,899.20.

After providing for the investment of the endowment he sets forth the main trust and purpose as follows: "The net income of said Endowment shall be used to promote applied science:

" *First,* By maintaining professorships, workshops, laboratories and collections for any or all of those scientific subjects, which have, or may hereafter have, applications useful to man and

" *Second,* By aiding meritorious and needy students in pursuing those subjects."

He adds, "Inasmuch as a large part of my life has been devoted to the study and invention of machinery, I instruct the President and Fellows to take special care that the great subject of mechanical engineering in all its branches and in the most comprehensive sense, be thoroughly provided for from my Endowment.

"I direct that the President and Fellows be free to provide from the Endowment all grades of instruction in applied science, from the lowest to the highest, and that the instruction provided be kept accessible to pupils who have had no other opportunities of previous education than those which the free public schools afford."   Directions are given as to details, such as the salaries of professors, providing them with suitable assistance, and ensuring modern equipment of the best design and quality.   He directs that the President and Fellows be "free to erect buildings for the purposes of this Endowment, and to purchase sites for the same, but only from the income of the Endowment."   Then follows:

"Finally, I request that the name Gordon McKay be permanently attached to the professorships, buildings, and scholarships or other aids for needy students, which may be established, erected or maintained from the income of this Endowment." He inserted the further significant provision that, in the event of the failure of the University to accept the trust, the gift should go, not to any other existing institution, but to a new Massachusetts corporation which should be established to receive and apply the endowment "for the purposes and upon the terms above set forth in respect to said gift to Harvard College."

Reading this instrument in the light of the circumstances already referred to, it seems reasonably clear from its express provisions and implied limitations that Mr. McKay intended that not only the investment of the endowment funds but the education which his endowment was to make possible should be under the control and direction of the University, its government and administration. He selected as the trustee to carry out his purposes a great educational institution, one with whose ability adequately to carry out his plans he was familiar, and with whose historic name he desired to associate his own in perpetual memory.

In our opinion this intention of Gordon McKay is not in fact carried out in the agreement in controversy, as we have construed its provisions in their practical operation. As was said by this court in *Harvard College* v. *Society for Promoting Theological Education*, 3 Gray, 280, 301, in dismissing the suggestion that the trust fund might be held by the college, and the income paid over to and applied by a separate school: "We find no authority for adopting such a scheme for these charities, finding the trust to embrace the higher duty of supervision of the administration of these funds, and the mode of their application; and the purpose of the donors being such as we have stated." See also *Winthrop* v. *Attorney General*, 128 Mass. 258; *Cary Library* v. *Bliss*, 151 Mass. 364; *Boston* v. *Doyle*, 184 Mass. 373, 381.

What has been said disposes of the only question now before us for decision (aside from the rulings as to evidence, wherein we find no error), and it would be unwise as it is unnecessary to attempt to define in advance what particular administrative methods may legally be adopted by the University in carrying out the trust.

We are constrained to instruct the plaintiff that it cannot lawfully carry out this agreement between it and the Institute, as far as respects the property received by the University under the deeds of trust and the will of Gordon McKay.

*Decree accordingly.*