CHARLES V. BRIGGS & others *vs.* THE MERCHANTS NATIONAL BANK OF BOSTON, trustee, & others.

Suffolk.     May 5, 1948. — October 1, 1948.

Present: QUA, C.J., LUMMUS, DOLAN, & WILLIAMS, JJ.

*Charity. Trust,* Charitable trust; Application of trust property; Express trust: construction. *Lincoln. Municipal Corporations,* Trusts, Officers and agents. *Corporation,* Charitable corporation. *Constitutional Law,* Obligation of contracts, Charity. *Equity Jurisdiction,* Charity. *Equity Pleading and Practice,* Decree. *Words,* "Deficiency."

A conveyance in trust to the town of Lincoln of a tract of land therein with the buildings thereon and an art collection housed in the buildings to hold and maintain as a public park and museum for the benefit of the town's inhabitants, and provisions in the grantor's will establishing

trusts in furtherance of such park and museum and recreational and educational activities incidental thereto, created public charitable trusts whose benefits the town could accept whether or not it could expend its own tax-raised money for such purposes.

There was a proper case for the application of the doctrine of cy pres where it appeared that the dominant purpose of a donor by deed and by will was to establish a tract of land in the town of Lincoln and the buildings thereon and an art collection housed in the buildings as a public park and museum for the benefit of the inhabitants of Lincoln, but that that dominant purpose had not been accomplished and would not be accomplished chiefly because the donor's dispositions left the title to and control of such property in the town but, for twenty years after the donor's death, placed control of the expenditure of trust income indispensable to the support and operation of the project in the discretion of trustees whose negotiations with the representatives of the town respecting the project had reached "an impasse" which was not the result of a conflict of personalities or due to any lack of honesty or good faith; and this court therefore approved a scheme altering the mechanism provided by the donor to the extent necessary to save and carry out the dominant purposes of his gifts.

In cy pres proceedings this court approved a scheme overriding the provisions of a testamentary trust placing payments of income for furtherance of a public charity wholly in the discretion of the trustees by directing them to pay to a town a certain sum from income forthwith and thereafter seventy per cent of the net income; by changing somewhat methods of disposing of and acquiring certain personal property; by allowing the town to use income for educational and recreational activities incidental to the project, a power vested by the testator solely in the trustees; and, instead of the trustees forming a corporation to take over the trust property and their activities, as the will provided, by allowing the town to cause the formation of a corporation to act as its agency in operating the project.

In a provision of an instrument creating a charitable trust and authorizing the trustee to pay to a town from income such sums as the trustee might think necessary "to make up any deficiency in the income of" another charitable trust for the town created by the same settlor, the word "deficiency" did not mean deficit but meant an insufficiency of the income of the other trust to carry out the common objects of the two trusts.

An appropriate court might properly authorize a town to establish a corporation solely to act as the town's agency in managing real and personal property for certain charitable purposes for which the property had been given to the town and to receive income payable to the town from trust funds created by the donor for the support of the project, where the donor, in making his gift of the property to the town and in creating the trusts, had not prescribed any method by which the town must act.

Charitable gifts are made subject to the doctrine of cy pres, and the application of that doctrine in an appropriate case does not violate the constitutional provision forbidding impairment of the obligation of contracts.

Upon approving in general a certain cy pres scheme, this court authorized the trial court, in framing a decree to put the scheme into effect, to supply necessary additional detail, or to make necessary minor modifications, in a way not inconsistent with the main particulars of the scheme, and to provide in the decree that the case be retained for a reasonable time for such alterations in the scheme as experience with it might show to be necessary.

Testamentary trustees paying income to a town, or to a corporation acting as its agency, for charitable purposes under the terms of the will or the terms of a cy pres decree would not be required to see to the proper application of such money unless it were paid in such circumstances as would amount to participation with knowledge in a breach of trust.

A testamentary trustee directed by the will to pay over the income of the trust to a town for certain charitable purposes should pay over the income at reasonable intervals.

In a suit in equity by ten taxpayers of a town, to which a testator in his lifetime had conveyed property in trust for a charitable purpose, and by the town itself, against the attorney general and the trustees of two trusts established by the will of the testator for the support of such project, the trustee of one of such trusts having included a prayer for relief in his answer, the court had jurisdiction under G. L. (Ter. Ed.) c. 214, § 1, so far as it might not have had it under § 3 (11), to frame a complete cy pres scheme modifying the testamentary trusts, and to determine various incidental matters.

PETITION IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on April 14, 1947, by leave of court.

Following the report of a master, an interlocutory decree denying a motion of the respondents Webber and others, trustees, to recommit to the master and confirming the report was entered by order of *Spalding*, J., by whom the suit was reserved and reported to the full court.

*F. B. Wallis*, (*L. Wheeler, Jr., & N. C. Fitts* with him,) for the petitioners.

*A. C. Webber*, for Webber and others, trustees.

*W. J. Speers, Jr.*, for The Merchants National Bank of Boston, trustee.

*C. A. Barnes*, Attorney General, & *M. A. Fredo*, Assistant Attorney General, for the Attorney General, submitted a brief.

QUA, C.J.   This suit in equity is brought by ten taxpayers of the town of Lincoln under G. L. (Ter. Ed.) c. 214, § 3 (11), and by the town itself, against The Merchants National Bank of Boston (hereinafter called the bank) as trustee of

a trust (hereinafter called the A trust) created by the will of Julian de Cordova, late of Lincoln, Mr. Webber and four others as trustees under another trust (hereinafter called the B trust) created by the same will, and the Attorney General. The principal purpose of the suit is to secure modification by the court under the doctrine of cy pres of some of the terms of the A and B trusts and of still another trust upon which the town holds certain real estate conveyed to it by de Cordova in his lifetime. All three trusts are related to each other and are parts of one scheme or plan designed by de Cordova for the purpose of setting up in Lincoln a perpetual charity for the maintenance, in memory of himself and his deceased wife, of an art museum and park for the benefit of the inhabitants of the town. Further objects of the suit are to secure certain interpretations of the A and B trusts and directions to the trustees designed to remove doubts and to clarify their duties.

Consideration of a demurrer contained in the answer of the B trustees was reserved until the hearing on the merits. No separate discussion of the demurrer is required, since if the facts established by the master's report make a case for relief, the petition sufficiently states such a case as against any of the grounds set forth in the demurrer.

Julian de Cordova died November 23, 1945, at the age of ninety-five. On November 29, 1930, he had conveyed to the town, and the town had accepted, about twenty-nine acres of land on Sandy Pond. On this land were located his residence, a building known as the art gallery, and some incidental buildings. The conveyance also included the collections of pictures and of other objects of art and interest contained in the buildings. The grantor reserved a life estate to himself and also provided that after his death the town should hold the property in trust to maintain the land as a public park for the benefit of its inhabitants and the residence and art gallery for their benefit as a public museum under the name "The de Cordova and Dana Museum." It was provided that new buildings might be added or substituted, but that any of the objects of art might be disposed of only with the approval of an expert selected by the di-

rector or similar officer of the Museum of Fine Arts in Boston. To induce the town to accept this conveyance, de Cordova executed a sealed instrument wherein he covenanted with the town that he had deposited with the bank $250,000 in securities as a guaranty that if the town should accept the conveyance he would provide by will $150,000 for the benefit of the town for the upkeep, maintenance, and improvement of the premises and would make a further substantial provision for the town which, "subject to such reasonable discretions" as he might "interpose," would allow the income to be used in case of need for the upkeep, maintenance, or improvement of the park or museum. He did make these two provisions in his will in the form of the A trust and the B trust next hereinafter described.

By the twelfth article in his will de Cordova gave to the bank $150,000 in trust to pay the income to the town "for the upkeep, maintenance and improvement of the de Cordova-Dana museum and park in said Lincoln, which I have already given the town, subject to a life estate for myself." This is the A trust.

By the thirteenth article he gave the residue of his property to Webber and others in trust, with the provision that they might pay to the town from the income "such sum or sums as my said trustees from time to time may think necessary . . . to make up any deficiency in the income of the trust fund, hereinbefore created [the A trust], for the upkeep, maintenance and improvement of said museum and park . . .." It is provided that the balance of income is to be accumulated and added to the principal for a period of twenty years after the death of the testator. At the end of the twenty years the entire trust fund with its accumulations is to be paid over to the bank to be held by it in trust and the income paid to the town to be expended "solely in making up any deficiency in the income . . . [of the A trust] and for the use, improvement and additions to the said art collection, and the buildings in which they [*sic*] are housed," with the restriction that the town may make expenditures for additions to the art collection and may dispose of any parts of it only with the approval of

an expert selected as provided in the similar provision contained in the deed to the town. By the fourteenth article like powers to add to the collection and to dispose of parts thereof are given to the trustees Webber and others, subject to a like restriction. There is also, in the fifteenth article, a provision that the majority of the trustees, if they deem it expedient, may cause a corporation to be formed consisting of the trustees and their successors to which the trustees shall transfer the trust fund to be held upon the same trust with the same powers subject to the same restrictions as when held by the trustees. This trust of the residue given to Webber and others is the B trust. Indications are that when the estate is finally settled the residue that will go into this trust will have amounted to about $1,500,000. The trustees have already received some cash and securities having a book value of over $1,000,000.

By a codicil the testator authorized the "trustees named in said will" to use "such parts of the income, but none of the principal, for such educational and recreational purposes, which in their discretion, will be helpful in the fulfillment of the main purpose expressed in paragraph 13 of said will, and in the furtherance of the deCordova-Dana museum and park . . .," their discretion in the use of income for such purposes to be final.

It will be observed that the situation brought about by the deed and the creation of the two trusts in the will of the testator is that the town now owns and is in complete possession and control of the land, buildings, and collections and must use them for the park and museum; that the bank holds the A trust fund of $150,000 in perpetuity to pay the income to the town for the upkeep, maintenance and improvement of the museum and park; that Mr. Webber and others hold the much larger B trust fund to use so much of the income as they think necessary to make up any deficiency in the income of the A trust and to accumulate the remainder of the income and at the end of twenty years to turn over the entire fund to the bank to hold in perpetuity and to pay the income to the town for the purposes of the park and museum; that during the twenty year

period Webber and others are given certain powers of adding to and disposing of exhibits which in general they cannot exercise except with the consent of the town, since the town owns the exhibits [1] under the deed, which took effect in 1930 and takes precedence over the will, and the town has by virtue of the deed sole possession and control of the place of exhibition; that the B trustees may in their discretion also expend income for educational and recreational purposes ancillary to the main object of the park and museum; but that any activities for these purposes upon the site of the park and museum must, because of the town's possession and control under the deed, be subject to the consent of the town.

It now becomes necessary to summarize certain of the findings in the exhaustive report of the master. The art gallery, which is connected with the residence by an enclosed arched bridge, resembles a Norman chateau with round towers. The residence also has a tower and is surmounted by battlements. Both buildings are situated on a knoll fifty to seventy-five feet above the pond in the midst of fine old trees and well kept lawns. The quality of the collections is uneven, ranging from objects of real importance to others of little value. They were painstakingly acquired by the testator over a long period of years. According to the standards of great museums many of the objects cannot be rated as museum pieces, but, "taken as a whole, the collections have artistic, cultural and educational value and should be a source of interest and instruction to the inhabitants of the town, particularly to youth of school age." The value of the museum lies in the means it affords of studying art, ethnology, and to some extent archeology. "It should be an important cultural asset to the town." To these findings we may add as matter of common knowledge that Lincoln is a small town of about two thousand inhabitants lying within commuting distance of Boston in a broad belt devoted largely to country residences. In short, it appears that the park and museum are attractively located in a beautiful

---

[1] This statement is subject to an exception as to any exhibits acquired by the testator after the deed and before his death.

area; that the buildings are of unique design; and that the testator's object of maintaining the place as a public park and museum is not chimerical but under proper conditions is capable of practical realization substantially as intended by him, to the benefit of the inhabitants of the town. No contention is made to the contrary.

But further findings show that this object is not now being attained and under present conditions has little or no chance of ever being attained. Although the art gallery was open to the public in July and August of each year before the testator died, neither building has been open since his death. The difficulty has its roots in the money arrangements and divided authority of the present trusts. To begin with, structural changes must be made in both buildings, so that they will comply with State and municipal regulations pertaining to buildings used by the public, and immediate repairs are needed upon these buildings and other structures. The minimum amount for alterations and repairs required to open the museum and park to the public was found by the master in his report filed February 16, 1948, to be about $25,000. To put both buildings into first class condition would cost about $40,000. The condition of the residence is such that it would be unwise to economize on repairs. In addition to the sum immediately required to put the plant in condition, in order properly to operate it, without expending anything for educational and recreational activities, the town should be assured an annual income of not less than $25,000. But the only assured income the town has is the income of the A trust which will be no greater than from $4,500 to $5,200 a year.[1] It is fairly to be inferred from the findings that the park and museum will never be opened unless the town can begin receiving income from the B trust, the income from which would be more than

---

[1] We do not overlook the fact that de Cordova in his lifetime gave the town a total sum of $20,000 to accumulate until his death and then to be used in the sole discretion of the selectmen for repairs or improvements to, and for maintaining and operating, the museum and park. Even if the town were under some sort of obligation to use this money first, there would not be a really adequate amount to put the museum into operation, to say nothing of keeping it in operation, and the money would be expended without substantial accomplishment.

adequate for the purpose. The annual gross income of the B trust will be from $41,700 to $49,200. This income, however, is payable to the town only in the discretion of the B trustees, and they have neither paid a sufficient amount nor given the town adequate assurances that they will do so. Prolonged and elaborate negotiations between representatives of the town and these trustees have produced no tangible results. The B trustees have insisted that the town submit a budget for their approval and consult them on all matters of policy and all expenditures. They have been alarmed lest reports made by an expert hired by the town as to the quality of the collections would lead the town to dispose of large parts of them. Representatives of the town have contended that it was impossible to formulate a plan without knowing the amount of available income. The B trustees have never agreed among themselves as to any program of educational and recreational activities or as to how they would exercise the discretionary powers conferred upon them by the will. The negotiations resulted in "an impasse." No agreement was reached as to the repairs necessary, or their cost, or the amount of income to be paid to the town by the B trust, or as to the educational and recreational activities, or the amount to be spent therefor. The trustees have not agreed among themselves as to these matters, and the town has submitted no budget. The town desired that all the net income of the B trust should be paid to it, but a majority of the trustees took the position that part of it should be accumulated, though they were not in agreement as to how much. The director of the Museum of Fine Arts in Boston has notified the town that the trustees of that museum have decided that it would be improper for the director to take the responsibility of selecting an expert to approve disposals and acquisitions of objects of art as required in the deed and will. With matters in this state the present petition was filed.

Other findings of a general nature, but not stated to be merely conclusions from the findings hereinbefore set forth. are these: ". . . it is impracticable literally to carry out the testator's intention under the procedure and machinery

set up in the deed of November 29, 1930, and in the will and codicil, because of the divided control between the town of Lincoln and the B trustees which will continue during the twenty year period immediately following the testator's decease, and because of the restrictions and uncertainties, hereinbefore referred to, which have led to the present impasse and prevented the opening of the museum and park to the public since the testator's death on November 23, 1945. This impasse is not the result of a conflict of personalities. Nor is it due to any lack of honesty or good faith on the part of the trustees or the representatives of the town. It is due chiefly to the fact that while the town has the legal and equitable title to the real estate and personal property described in said deed, with full power to govern, manage, and control the museum and park exactly as it sees fit (provided it complies with the provisions of the deed), the trustees of the B trust have control of the purse strings. The town can dispose of any or all of said personal property, erect new buildings, alter any of the existing buildings, determine the type or kind of museum and park it shall operate, the nature and extent of the activities to be conducted upon the premises, and in general can manage and operate its property as it pleases. However, it cannot legally appropriate money for such purposes and must look to the income from the A trust and the B trust, if it is to carry out the intention of the testator. The result is that the B trustees, by virtue of their right to pay or to withhold income from the B trust during said period of twenty years after the testator's decease, can prevent the town from carrying out de Cordova's general charitable intent." To operate the museum properly, "it is essential that a long range program be adopted," but "it is not practicable for the town to formulate such a program unless it can be assured of a definite, annual income from the B trust fund. Under the present provisions of the B trust, the town officials cannot determine what portion of the income will be made available to them during said twenty year period expiring in 1965. And with the best of good will, the trustees of that fund cannot assure the town on

this score.  Even if unanimous action on all proposed payments to the town may not be necessary, the trustees cannot exercise their discretionary powers in futuro so as to bind their successors in trust who will have the same discretionary powers during said twenty year period.  The uncertainty is further increased by the fact that neither the town nor the present trustees of the B trust can know in advance what portion of the income therefrom will be expended by the trustees during said period, for additions to the art collection authorized by paragraph 14 of the will or for educational and recreational purposes under the codicil.  These difficulties are inherent in the provisions contained in the will and codicil."

Other difficulties confront the town.  There are objects in the collections which should be disposed of as not being worthy museum exhibits, but this cannot be done because of the refusal of the authorities of the Museum of Fine Arts in Boston to permit its director to select the required expert.  The same difficulty exists with respect to the discretionary power of the B trustees to make additions.  Moreover the town is wholly dependent upon the discretion of the B trustees for additions within the twenty year period. While the B trustees are authorized to use income for educational and recreational purposes during the twenty year period, no authority is given the town to use income of either the A or B trusts for such purposes either during or after the termination of the twenty years.  Time "has demonstrated that it is impracticable, and perhaps impossible, to carry out literally the provisions of the deed, will and codicil.  The town should be assured of the payment of income from the B trust sufficient in amount to meet the cost of alterations and repairs necessary in order to open the museum and park to the public; and also of the annual payment of a definite amount of income from the B trust, to be used for the upkeep, maintenance and improvement of the museum and park, and for additions to the art and other collections in the museum and for educational and recreational purposes during said twenty year period following the testator's decease.  Authority should

also be given the town to use income from the B trust, after the expiration of said twenty year period, for such educational and recreational purposes in connection with the operation of the museum and park as it may decide to be necessary or desirable."

The master, having concluded within the broad scope of the interlocutory decree referring the case to him that it is a proper one for application of the doctrine of cy pres, proceeded in accordance with the decree to frame a scheme. In general outline this scheme provides:

(1)[1] That the B trustees make certain payments to the town to reimburse it for expenditures for upkeep in the years 1945, 1946, and 1947.[2] This recommendation need not be considered, since we are informed in the brief for the petitioners that the trustees have already made these payments.

(2) That the B trustees be authorized and directed to pay to the town out of net income accumulated prior to January 1, 1948, a sum or sums not to exceed $40,000 in all to be used by the town, in its sole discretion, for such alterations and repairs as the town may consider necessary or desirable in order to open the museum and park to the public, and to be paid upon the presentation by the town of estimates of cost. No part of this sum is to be used by the town for the purpose of demolishing the residence or art gallery or for additions to the present collections.

(3) That the B trustees and their successors be authorized and directed to pay to the town beginning January 1, 1948, and continuing during the twenty year period following the testator's death seventy per cent of the net income of the B trust, to be used by the town in its sole discretion for the upkeep, maintenance, and improvement of the museum and park, for additions to the collections, and for educational and recreational purposes.

(4) That neither the town, nor any corporation organized as its agent, nor the trustees of the B trust acting under

---

[1] The subdivisions numbered in parentheses are those made by the master.

[2] These expenditures were made by the town out of the sum of $20,000 given to it by the testator to which reference was made in a preceding footnote.

paragraph 14 of the will shall add to or dispose of any part of the collections unless the town or its agent or said trustees shall have first received written approval of such addition or disposition from an art expert selected or recommended by the director of the Museum of Fine Arts in Boston or by the officer or board exercising similar authority, or in the event of the refusal to act of such director, officer, or board, then by an art expert selected or recommended by the corresponding officer or officers of any one of several other named art museums.

(5) and (6) That the net income of the B trust remaining in the trustees' hands after making the payments required by (1), (2), and (3) above be disposed of by the trustees according to the will and codicil.

(7) That after the expiration of the twenty year period the town may use income from the B trust for such educational and recreational purposes in connection with the operation of the museum and park as it may decide to be necessary or desirable.

Numbers (8) and (9) do not in our opinion involve any change in the terms of any of the trusts and will be dealt with later in this opinion as matters of construction merely.

(10) and (11) That the town be authorized to cause a charitable corporation to be organized to act as its agent and instrumentality in carrying out the trust imposed upon the town by the deed of November 29, 1930, and, if the town shall so elect, to receive payments from the A and B trusts, with power to accept gifts from other sources, the officers and members of which corporation are to be voters of the town, and the directors of which are to be divided into classes chosen respectively by the voters of the town, by the selectmen, by the school committee, and by the trustees of the public library. Title to the property is to remain in the town.

Objections to the master's report filed by the B trustees, in so far as they raise genuine questions, will be hereinafter covered in dealing with the merits.

We have carefully examined the motion of the B trustees

to recommit the case to the master, and we are satisfied that there was no error in its denial. Discussion of its details would prolong this opinion to no purpose.

. The evidence heard by the master, which must have been extensive, has not been reported. The master's findings of fact must stand and will govern the disposition of the case.

All three trusts, that of the tangible property held by the town, the A trust, and the B trust, are public charitable trusts in all their aspects, including the park, the museum, and the proposed recreational and educational activities in connection therewith. *American Academy of Arts & Sciences* v. *Harvard College*, 12 Gray, 582, 594. *Drury* v. *Natick*, 10 Allen, 169, 179–180, and cases cited. *Burbank* v. *Burbank*, 152 Mass. 254, 255–256. *Bartlett, petitioner*, 163 Mass. 509, 514. *Dexter* v. *Harvard College*, 176 Mass. 192, 194–195. *Hubbard* v. *Worcester Art Museum*, 194 Mass. 280, 289. *Richardson* v. *Essex Institute*, 208 Mass. 311, 318. *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 254–255. The town could accept these gifts for these purposes, whether or not the town could expend its own tax raised money for similar purposes. *Higginson* v. *Turner*, 171 Mass. 586, 591. *City Bank Farmers Trust Co.* v. *Carpenter*, 319 Mass. 78, 79–80.

The facts clearly disclose de Cordova's dominant purpose to establish his home place and its contents as a public museum and park for the benefit of the town. To this purpose he devoted in one form or another all that he had, except a few legacies of comparatively small amount. No other object whatever is mentioned or provided for in any of the trusts as a possible alternative or otherwise. It also clearly appears that because of the mechanism of the several trusts and their relation to each other this primary purpose has so far wholly failed of accomplishment, and that its accomplishment in the future has "become impracticable" (the words used in G. L. [Ter. Ed.] c. 214, § 3 [11]), and indeed practically impossible. Equity will not permit charitable gifts to fail in this manner. It will presume that the donor would attach so much more importance to the object of the gift than to the mechanism by which he intended to accom-

plish it that he would prefer to alter the mechanism to the extent necessary to save the object. We agree with the master that this is a proper case for application of the doctrine of cy pres. *Sanderson* v. *White*, 18 Pick. 328, 333. *Harvard College* v. *Society for Promoting Theological Education*, 3 Gray, 280. *Jackson* v. *Phillips*, 14 Allen, 539, 574–596. *Cary Library* v. *Bliss*, 151 Mass. 364, 374. *Judkins* v. *Hyannis Public Library Association*, 302 Mass. 425, 427. *Milton* v. *Attorney General*, 314 Mass. 234. *Trustees of the Putnam Free School* v. *Attorney General*, 320 Mass. 94. Scott on Trusts, §§ 399, 399.2, 399.4. Many cases from our reports and elsewhere illustrating various applications of this doctrine have been cited in the briefs. Citations need not be multiplied here.

The plan submitted by the master seems to us in general adequate and proper to carry out the esssential purpose of the donor and at the same time to preserve as far as reasonably practicable the details of his original scheme. The principal departure from the donor's terms is that involved in superseding the discretion of the B trustees as to seventy per cent of the net income of the B trust and requiring them to pay it to the town. We are naturally reluctant to interfere with a discretion reposed by the testator in men of his own choice, but there is no positive rule forbidding reasonable modification of discretionary provisions where necessary to save the charity. See *Minot* v. *Baker*, 147 Mass. 348, 352; *Chase* v. *Dickey*, 212 Mass. 555, 567. At this point the master strikes at the root of the whole difficulty. The amount required to be paid to the town, when added to the income of the A trust, will hardly exceed by much more than a reasonable margin of safety the minimum amount required to operate the museum in a reasonably satisfactory manner. It seems likely that, unless conditions prove altogether favorable, no very considerable amount will remain for the acquisition of new exhibits or for educational or recreational activities. The town must be assured of this money, or it cannot operate the museum. The trustees will not and cannot give the assurance. There is no other source from which the money can be obtained. It would seem

that the town has no authority to appropriate money raised by taxation to the operation of a museum. See *Ducey* v. *Webster,* 237 Mass. 497, 498; *Attorney General* v. *Lowell,* 246 Mass. 312, 320; G. L. (Ter. Ed.) c. 40, § 5, as amended. But even if it has such authority, we do not find that anywhere in the circumstances or documents connected with its acceptance of the gifts it has bound itself to do so. On the contrary it insisted upon and obtained a guaranty from the donor that he would provide for maintenance. *Milton* v. *Attorney General,* 314 Mass. 234, 237. Compare *Adams* v. *Plunkett,* 274 Mass. 453, 464. The museum is the kernel of the whole enterprise. If the trustees are not required to pay this income to the town the enterprise will fail. They may accumulate or otherwise dispose of the remaining thirty per cent for the benefit of the museum and park in their discretion according to the terms of the will. Under the present form of the trusts the difficulty is not of a kind that can be remedied by instructions or orders to the trustees in specific instances or by a change in the personnel of the trustees. The "impasse" is continuing and will persist through the entire twenty year period unless this court acts. The testator could not have anticipated such a situation. Certainly he did not contemplate that the museum should remain closed and deteriorate during the twenty year period which must elapse before the town acquires complete control of the income. Moreover, on the findings of the master it seems essential to the successful operation of the museum during the twenty year period that the town should be able to use B trust income to acquire additions to the collections, whatever may be the true construction of the will on this point. The proposed scheme provides for this under safeguards similar to those imposed by the testator.

Equally indispensable to the opening of the museum is the payment of $40,000 from accrued income of the B trust for necessary alterations and repairs.

At the request of the petitioners and in accordance with the apparent intent of the testator as found by the master, with whose finding we agree, and in order to reassure the trustees upon a point which seems to have disturbed them,

there should be included in the decree a provision to the effect that none of the B trust income payable to the town shall be used by the town for the erection of any new building to take the place of the residence or art gallery until after the expiration of the twenty year period, but that the town may use such income for the demolition of a garage and boat house the present condition of which makes this necessary, without substituting new buildings. The decree should also contain a provision, in accordance with a finding or ruling of the master with which we agree, that the word "deficiency" does not mean deficit, but means an insufficiency of the income from the A trust to carry out the plans of the town for upkeep, maintenance, and improvement of the museum and park. It is plain that such deficiency already exists.

The provisions of the proposed plan relative to the disposal and acquisition of exhibits seem necessary to successful operation of the museum. The testator contemplated that changes would be made in the collections from time to time, and indeed it would seem that this must occur in any properly managed institution of the kind. The plan makes this possible with a minimum. of conflict due to divided authority and removes the obstacle encountered in the refusal to act of the Museum of Fine Arts in Boston, while at the same time endeavoring to carry out the testator's intent that changes in the exhibits should be made only upon the advice of competent experts.

The provisions of the proposed plan relative to the use by the town of income for educational and recreational purposes both during and after the twenty year period are a considerable departure from the provisions expressed by the testator. Yet we are of opinion that they do not go too far. Since it is necessary to make changes in the machinery of the trusts under the cy pres principle, it would seem that we ought not to circumscribe these changes so narrowly as needlessly to weaken the institution which the testator intended to establish, but rather that we should leave open for efficient exercise all powers fairly comprehended within his dominant object in order that the insti-

tution may realize the complete success which he hoped for it. Educational activities of one kind or another would seem almost an integral part of the operation of an efficient and useful public museum, and recreational activities naturally belong to a public park in a country district by the side of a lake. It is clear from the codicil that the testator contemplated both types of activity, although he committed them to the discretion of his trustees and made no express provision for them after the twenty year period. This omission may well have been an oversight. Because of division between control of the premises and control of the money it seems probable that the same difficulties will arise in relation to these matters that have made it necessary to modify the original provisions in respect to repairs, maintenance, and exhibits. Moreover, it is particularly important that immediately upon the establishment of an institution like that here contemplated plans should be adopted directing its future course and scope and visualizing the peculiar position which it is to occupy among other more or less.similar institutions in the vicinity. Knowledge that no funds were to be available for educational or recreational activities after. the twenty years would reduce such activities within that period to a temporary status and would tend to prevent the development of a well rounded permanent program suitable for such an enterprise.

The proposal for the establishment of a corporation merely as an agency of the town to manage the museum and park involves only the most technical, if any, departure from the testator's terms. This provision is made optional with the town. A vote of the town would be required in order to establish a corporation.[1] The testator must have known that some board or agency of the town would handle the property and the payments. He prescribed no method by which the town must act. The case is distinguishable on this ground from *Adams* v. *Plunkett*, 274 Mass. 453. The town could doubtless create a board to manage the museum and park and could select its members in the same manner

---

[1] A vote authorizing the establishment of a corporation was adopted by the town at a town meeting held March 3, 1947.

as the officers of the proposed corporation would be selected and could charge them with the same duties. *Adams* v. *Plunkett*, 274 Mass. 453, 462. See G. L. (Ter. Ed.) c. 40, § 3, last sentence. There seems to be no objection to the creation of an agency in corporate form where one is provided for in the will or authorized by the appropriate court, and there may well be advantages which are pointed out in *Ware* v. *Fitchburg*, 200 Mass. 61, where the creation of a corporation to act as an agency of the city in receiving and administering a fund given by will to the city for purposes of a hospital was held not inconsistent with the bequest. See *Nelson* v. *Cushing*, 2 Cush. 519; *Burr* v. *Massachusetts School for the Feeble-Minded*, 197 Mass. 357, 359; *Boston* v. *Curley*, 276 Mass. 549, 557–559; *Curtis* v. *First Church in Charlestown*, 285 Mass. 73, 80; *Boston* v. *Dolan*, 298 Mass. 346, 349. The court in framing a scheme cy pres possesses power to permit the formation of such a corporation where it believes that such a course may strengthen the scheme for carrying out the object for which the charity was established. It was said in *Codman* v. *Brigham*, 187 Mass. 309, 314, "That the hospital is to be established and maintained by a corporation, rather than by personal trustees, is not of the essence of the gift." Cases like *Harvard College* v. *Attorney General*, 228 Mass. 396, and *Shattuck* v. *Wood Memorial Home, Inc.* 319 Mass. 444, where there had been no failure of the charity in its original form, are distinguishable.

There are no valid constitutional objections to the proposed plan. Once the postulate is accepted that the charitable trusts will fail unless reconstructed, constitutional difficulties vanish. The findings of the master compel us to accept that postulate. The doctrine of cy pres is not unconstitutional. The gifts were originally made subject to the law embodied in that doctrine. No property is taken. On the contrary the beneficial use of the property is secured to those for whom it was intended. The obligation of no contract is impaired. *Boston* v. *Curley*, 276 Mass. 549, 560. There is nothing in *Cary Library* v. *Bliss*, 151 Mass. 364, or in *Adams* v. *Plunkett*, 274 Mass. 453, contrary to what is here decided.

We realize that in drafting the decree to put in effect the proposed scheme questions of detail not now anticipated may arise. The single justice is therefore to be at liberty to supply additional necessary detail or even, if necessary, to modify the scheme proposed by the master in minor particulars in a way not inconsistent with its main provisions. It is intended, however, that the scheme as reported by the master shall, in general, be adopted as the basis of the decree on this part of the case, with the slight modifications expressly indicated in this opinion. The decree may provide that the cause be retained for a reasonable time for such alterations in the scheme as experience with it may prove to be required for successful operation of the charity. See *Drury* v. *Natick*, 10 Allen, 169, 184.

It remains to deal with certain matters of construction which, while not strictly a part of a cy pres scheme, should nevertheless be considered and covered by the decree in order that the scheme may be freed from possible hampering doubts and for the protection of the trustees in connection with it. These matters are contained in the three next following paragraphs.

(1) We agree with the master that the guaranty agreement hereinbefore mentioned, with its amendments, has been fully carried out, and that the A trust fund is now held by the bank "without reference to, or restriction by," said agreement or its amendments.

(2) Neither the bank nor the B trustees are required in paying income from either trust to the town or to the proposed corporation, if formed, to see to the application of such income, unless the money is paid in such circumstances as amount to participation with knowledge in a breach of trust. *Andrews* v. *Sparhawk*, 13 Pick. 393, 400–402. *Goodrich* v. *Proctor*, 1 Gray, 567, 570. *Ashton* v. *Atlantic Bank*, 3 Allen, 217. *Newburyport* v. *First National Bank*, 216 Mass. 304. *Eastern Mutual Ins. Co.* v. *Atlantic National Bank*, 260 Mass. 485, 488. *Ogden* v. *Atlantic National Bank*, 276 Mass. 130, 133. Scott on Trusts, §§ 321, 321.1, 321.2. See *Dillaway* v. *Burton*, 256 Mass. 568, 573.

(3) The bank is to pay the net income of the A trust either

to the town or to the proposed corporation, if and when the latter is organized, at reasonable intervals, including both income undistributed at the date of entry of the decree and income thereafter received, but is to be fully credited with income properly paid to the town prior to the entry of the decree.

We must not be understood as necessarily intending to decide that every point here considered could be raised in a suit brought solely by ten taxpayers under G. L. (Ter. Ed.) c. 214, § 3 (11). To this suit the town is also a party plaintiff, and the bank has inserted prayers for relief in its answer. The court at the instance of the town has general equity jurisdiction, apart from the statute last mentioned, over application of the doctrine of cy pres. G. L. (Ter. Ed.) c. 214, § 1.

An interlocutory decree is to be entered overruling the demurrer.

The interlocutory decree denying the respondents' motion to recommit, overruling their exceptions to the master's report, and confirming the report is affirmed.

A final decree is to be entered by the single justice in accordance with this opinion.

Expenses, including a reasonable sum for counsel fees, may be allowed to the petitioners in the discretion of the single justice, to be charged upon the B trust, out of which the substantial issues have arisen. The trustees of the A and B trusts will be entitled to reasonable allowances in their respective accountings. *National Shawmut Bank* v. *Morey*, 320 Mass. 492, 503, and cases cited.

*So ordered.*