## Jordan's Estate.

Argued January 17, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*E. M. Biddle, Jr.,* with him *Caleb S. Brinton* and *George Wharton Pepper,* for appellant.—Even when approved by the court below the findings of an auditor will be set aside in the appellate courts in so far as they are really inferences drawn from facts rather than pure findings of facts if they are not correctly reasoned or inferred: Nixon's Est., 104 Pa. Superior Ct. 506; Dingee v. Wood, 228 Pa. 250.

The fact which is to be decided, is not whether, as a matter of abstract analysis and definition, the academy continues to exist as an academy or college, but whether what has happened to it is a going out of existence in the sense in which the testator used that phrase: Harvard College v. Attorney General, 117 N. E. 903.

*George Hay Kain,* with him *Allen C. Wiest* and *Donald H. Yost,* for appellee.—The report of an auditor in the orphans' court has the weight of a verdict of a jury and is not to be set aside on a question of fact, except upon grounds that should justify the court in granting a new trial in a proceeding according to the course of the common law: Hottenstein's App., 2 Grant 301; Harris's App., 2 Grant 304; Husted v. Engineering Co., 296 Pa. 376.

The reciprocal teaching agreement is temporary in character, determinable virtually at will, and the academy retains sole control of its work.

The rule of equity on this subject seems to be clear that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity, for equity will substitute another mode, so that the substantial intention shall not depend on the sufficiency of the formal intention: Phila. v. Girard's Heirs, 45 Pa. 9; Mears's Est., 299 Pa. 217.

The college charters are safe from alteration, but it is well settled that by and with the consent of the institution amendments may be made: Houston v. Jefferson College, 63 Pa. 428; St. Mary's Church, 7 S. & R. 517.

OPINION BY MR. JUSTICE SIMPSON, March 20, 1933:

The will of John C. Jordan gives his residuary estate to trustees upon an active trust, and directs that the interest and income therefrom shall be applied, first, to paying the cost and expense of administering the trust; second, to pay the expense of keeping the family cemetery lot and the tombstones therein in good order and repair; third, to pay two-thirds of the remainder of the annual interest and income to "The Rector, Church Wardens and Vestrymen of the Protestant Episcopal Church of St. John, at Yorktown," yearly and every year forever; and fourth (which we quote exactly), "to pay the remaining one-third of the remainder of said annual interest and income to 'The Trustees of the York County

Academy,' Provided however that in case the last mentioned corporation shall be dissolved, or The York County Academy shall go out of existence as an academy or a college, or the said 'The Trustees of the York County Academy' shall fail or neglect for five consecutive years to maintain a school in which the English language, Latin, Greek, Mathematics and the Natural Sciences shall be taught during at least nine months in each and every year, the said share or portion of the remainder of said annual interest and income shall be forfeited by the said 'The Trustees of the York County Academy' and in that event the whole of the remainder of the said annual interest and income arising from the said rent, residue and remainder of my estate in the hands or possession of my said trustees or their successors shall be paid by them to 'The Rector, Church Wardens and Vestrymen of the Protestant Episcopal Church, at Yorktown' yearly and every year forever." For convenience, these two institutions will hereinafter be called the Academy and the Church.

At the settlement of the trustees' account, "the one-third of the remainder of said annual interest and income," as shown thereby, was claimed by both the Academy and the Church; the contention of the latter being that the former had gone "out of existence as an academy or a college." It admitted that the academy had not been dissolved, nor had it for five consecutive years neglected to maintain a school with the foregoing curriculum. An auditor appointed by the court below, and that tribunal itself, each decided against the Church, and from the resulting decree it now appeals.

We cannot sustain appellee's contention that we should affirm the decree because it is based on findings of fact which, having ample evidence to support them, must, under our general rule, be accepted as correct. We repeat our adherence to that rule in proper cases, but the present one is outside both its reason and spirit. No testimony was taken; a specific stipulation of facts was

agreed upon, and upon them and the inferences drawn from them, the decree below was based. We have several times said that we are quite as able as an auditor or the court below to weigh admitted facts and to draw the proper inferences from them, and hence, in such cases, cannot properly apply the rule relied on: Mirkil v. Morgan, 134 Pa. 144, 155; Gilbraith's Est., 270 Pa. 288,289; Belmont Lab., Inc., v. Heist, 300 Pa. 542, 547. Nor can we follow appellee in its intimation that appellant cannot claim because, if appellee has forfeited its right, the income should be awarded, under the cy pres doctrine, to another charity akin to that of appellee. There is no room here for the application of that doctrine; testator having declared what shall be done with the fund in case the Academy is excluded from participation in it, and there being no law or public policy antagonizing his disposition of it, we have to award it as he directed, since, under such circumstances, he had an inalienable right to do as he pleased with his own.

What, then, does the provision under consideration mean? It does not refer to the dissolution of the corporate entity of the Academy, for that had already been provided for. It does not refer to its continuance as an institution in which "the English language, Latin, Greek, Mathematics and the Natural Sciences shall be taught," for that, also, is elsewhere provided for. True, it may be presumed that testator expected these subjects would always be part of the curriculum of the academy or college he intended to aid; but the fact that it was only after "five consecutive years" of such failure that the forfeiture could be declared upon this ground, makes it evident that testator did not intend that a default for a lesser period of time would alone justify a forfeiture on the ground that this showed it was not "an academy or a college." It is clear to us, therefore, that the clause under consideration means that the trustees are required to maintain an institution of learning, which, from time to time, may properly be designated as "an academy or a

college;" and we turn at once to the preceding status of the case, and then to the facts disclosed by the record, to see whether or not appellee has forfeited its right to the fund for the reason alleged.

At the time testator's will was executed, and also when it was probated, the academy was operating under a charter granted by a special act of assembly, dated March 1, 1799: 16 Stat. at L. 181. Before the passage of this statute, the church had been conducting a school upon the property, which was then owned by it, but the burden had become too heavy, and so it tendered the property to the legislature, "in order that the same may be appropriated for a public school for the County of York." After so stating, the statute provides "That there be erected, and hereby is erected and established, in the Town of York, in the County of York, a county school or academy, for the education of youth in the learned and foreign languages, the useful arts, sciences and literature, the style, name and title of which said school or academy, and the constitution thereof, shall be, and are hereby declared to be, as is hereinafter mentioned and defined, that is to say: First. The said academy shall be hereafter called and known by the name of 'The York County Academy;' Second. That the said academy shall be under the management, direction and government of twenty-one trustees, or a quorum or board thereof, [the first trustees being named therein, who] ......shall be competent and capable......generally, by and in the same name, to do and transact all and every the business touching or concerning the premises, or which shall be incidentally necessary thereto, as fully and effectually as any natural person or body politic or corporate, within this Commonwealth, have power to manage their own concerns, and to hold, enjoy and exercise all such powers, authority and jurisdictions, as are customary in other seminaries of learning...... Seven or more of the said trustees shall be a board or quorum, and a majority of them shall be capable of doing and

transacting all the business and concerns of the said academy,......of electing trustees to supply any vacancies that may happen, by death, resignation or otherwise, of electing and appointing the principal and masters of the said academy, of agreeing with them for their salaries and stipends, ascertaining their several duties and powers, and removing them for misconduct or breach of the laws of the institution, of appointing committees of their own body to carry into execution all and every the resolutions of the board......and, generally, a majority of the board, or quorum of the said trustees...... shall determine all the matters and things (although the same be not herein particularly mentioned) which shall occasionally arise, and be incidentally necessary to be determined and transacted by the said trustees. ......
*Nor shall any disuser or nonuser of the rights, liberties, privileges, jurisdictions and authorities, hereby granted to the said corporation, or any of them, create or cause a forfeiture thereof."* The statute further provided "That the constitution of the said academy, herein and hereby declared and established, shall be and remain inviolable forever, and the same shall not be altered by any ordinance or law of the said trustees, nor in any other manner than by an act of the legislature of this State."

Testator's will was executed in 1908, prior to which time he had been a trustee of the Academy for eight years, under the charter above quoted. We must assume, therefore, that his gift to the Academy was made with a knowledge of the powers and duties of the trustees under the charter, and in the light thereof.

We turn, then, to the facts upon which the Church relies as showing that the Academy is no longer "an academy or a college." So far as appears, no complaint is made as to anything happening during the academy's existence for a century and a quarter prior to 1923. In earlier days the number of scholars varied from 34 to 75. In the latter part of 1922, the then principal of the Academy, who had occupied that position for a number of

years, resigned on account of ill health, and a new one was elected in his place and stead. The latter served until the end of 1926, and the number of scholars during those years varied from 20 to 31. He, too, then resigned, and again another principal was elected. The number of scholars continued to fall off. In 1927 there were but 8 pupils, in 1928 from 6 to 9, and in 1929 there were 12. The cause for this falling off is not agreed to, but doubtless it was due in large part to the fact that the school building, both as to character and location, had ceased to be a good place for the Academy to be carried on. The building was erected about 1787, and thereafter had not been substantially altered "except as to the interior arrangement of rooms and the installation of heating, lighting and toilet conveniences." This is admitted, as is also the fact that "The building is not adapted to the needs of a modern educational institution, and is located in a section of the city which is no longer desirable for residences and which is occupied largely by manufacturing industries."

This was the situation the trustees faced when, on November 10, 1927, they wisely "Resolved that the President appoint a committee to investigate the situation of the Academy and to report as to its future policies and possibilities." On November 1, 1928, they resolved that it would be beneficial to sell the building, subject to the approval of the board of trustees as to the price. No sale was made, however; but, on May 2, 1929, it was "Resolved, that the York County Academy be not opened or conducted during the academic year 1929-30 at the present location, and that the said York County Academy be opened and conducted during said year at the building of the York Collegiate Institute [hereinafter called the Institute] if satisfactory arrangements can be made with the authorities" of the Institute, which had a well located and equipped school. These negotiations resulted in what is termed a reciprocal teaching agreement between the two institutions.

This agreement, which was executed by both parties thereto on June 10, 1929, provided that the "Academy shall elect a principal......and employ at least two teachers who shall......conduct a school in which the English language, Latin, Greek, Mathematics and the Natural Sciences shall be taught during at least nine months in each and every year." It will be noticed that this is the exact language of the requirement in testator's will. The agreement further provided that the Academy may also "employ such teachers of the Institute as it may determine, at such salaries, nominal or otherwise, as the Academy may determine, for the purpose of assisting in the instruction of the branches contemplated to be taught by the Academy;" that the "Institute shall give to the trustees of the Academy and to its principal, masters, teachers and students such use of the buildings, grounds, facilities and equipment of the Institute as may be necessary......in common with" the like officials and students of the Institute. "All students applying to either institution for instruction shall be enrolled as students of both institutions. The fees for tuition and other charges of all such students shall be those fixed from time to time by the trustees of the Institute, and, in consideration of the rights and privileges hereby granted to the Academy, shall be paid to the Institute for its own use," but the Institute shall admit, as the Academy had been required to do, not exceeding seven students who shall be taught gratis. The agreement then provides that the two institutions shall adopt a "curriculum including the branches hereinbefore designated to be taught by the Academy," that graduates receive "a joint diploma or certificate of the two institutions" and that the agreement shall continue in force and effect for the academic year 1929-30," and for each such year therafter, unless either institution shall give to the other a notice of withdrawal therefrom before April 1st of any year.

At the time the Academy executed the reciprocal teaching agreement, it elected a member of the faculty of the Institute as master of the Academy, and authorized the employment of such other teachers as may be required, "all salaries, however, not to exceed in the aggregate the estimated net income of the Academy for the academic year." It also authorized the employment of the "York Trust Company to close and care for the building [of the Academy], and put the real estate on the market for sale." On account of the present controversy, the agreement was so altered as to authorize the Academy to employ but one master for the academic year of 1930-31, but otherwise it continued in force as originally drawn. Before its execution the Academy was "conducted by a principal and not more than two assistants, and for a large portion of that period with but one assistant." During that time the tuition fees of the scholars were received and retained by the teaching staff, in lieu of salaries; after as well as before the date of the agreement, "The corporate organizations and treasuries of the Academy and Institute continued to be separately maintained. Of the trustees of the institutions, two persons, both of whom were former students of the Academy and graduates of the Institute, are on both boards. Otherwise there are no common trustees."

These are all the facts from which we are to determine whether or not the Academy has gone "out of existence as an academy or a college." In considering this, it must be remembered that appellant, as the affirmant, has the burden of proof of showing it, and that burden is not a light one, since to sustain the contention would, in effect, work a forfeiture, which, in really doubtful cases, the courts will not do: Henry B. Chew's App., 45 Pa. 228; Friend's Est., 209 Pa. 442, 446. We are convinced that it cannot be sustained here. The Academy has done nothing in violation of any of the provisions of its charter, and appellant does not contend that it has. There is no challenge of the good faith of the trustees, nor, so far as

disclosed by this record, could there be. Indeed, appellant does not even challenge the wisdom of entering into the reciprocal teaching agreement, nor claim that the result has not justified the course pursued. Its entire objection seems to rest in its inquiry: "What could [testator] have had in mind [in the clause under consideration] except the cessation of the Academy's existence as an independent, self-governing institution?" If he had meant this, it would have been easy to say so. But he did not say it. He did not say that his bounty to the Academy should cease if it went out of "existence as an independent, self-governing institution," but if it went "out of existence as an academy or a college." He did not even anchor it to its then present condition as an academy, but looked forward to its possibly becoming a college. There is nothing in the reciprocal teaching agreement which stands in the way of the Academy returning to its original position, by simply exercising its reserved power of revoking that agreement, in the way provided in it. Hence, because of this, it must be held to be "an independent self-governing institution," though, in exercising the powers contained in its charter, it works, for the time being, in harmony with the Institute, and with it jointly uses some of its facilities.

President & Fellows of Harvard College v. Attorney General, 228 Mass. 396, repeatedly referred to by appellant, is entirely beside the point involved here. It is not even necessary to invoke the rule that, in will cases, supposed precedents are entitled to but little weight (Reiff v. Pepo, 290 Pa. 508; Scott's Est., 301 Pa. 509), for, in the Harvard College Case and in this one, the situation and surroundings of the parties and the language of the wills are different. Such similiarities as exist are alike tenuous and superficial.

In all that we have said in this opinion, we have not considered, because not required to do so, how far, if at all, the Academy, because of the several provisions in its charter of incorporation, has become subject to the legis-

lation respecting the common school system of the Commonwealth. We refer to it, that it may not be thought to have been overlooked.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellant.