## Banks' Estate

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

*Vincent P. Froio*, for exceptants.

*Milford J. Meyer* and *Eugene John Lewis*, contra.

KLEIN, P. J., February 21, 1963.—This family has been involved in acrimonious and protracted litigation for more than four years. The death of Harry Banks, decedent in this action, on August 16, 1959, appears to have intensified rather than reduced the bitterness of the parties.

On September 23, 1958, Clara Banks, decedent's wife, filed a bill in equity against her husband in the Court of Common Pleas No. 1, as of September term, 1958, no. 268. One month later, on October 23, 1958, she filed a fraudulent debtor's attachment against him in the Court of Common Pleas No. 2, as of September term, 1958, no. 1545. By stipulation of the parties, this second suit was transferred to No. 1 Court and consolidated with the equity action. A study of the record in this case reveals that a compromise in the nature of a family settlement was reached after the death of Harry

Banks, on October 19, 1959, in which the parties stipulated, inter alia, that a caveat which had been filed with the register of wills should be withdrawn. An agreement was also reached with respect to the manner in which his estate was to be distributed. This agreement was signed by Clara Banks and her three sons, Daniel, Maurice and Eugene (who was a minor), by decedent's two brothers, Morris and Samuel, and by his two sisters, Nettie Wilf and Jennie Jastrow, and was approved by Hagan, P. J. On July 1, 1960, more than eight months after the settlement was approved, Clara and her three sons filed another bill in equity in C. P. No. 1, as of June term, 1960, no. 1261, seeking to set aside the settlement, alleging that they had not known of the existence of a later will, dated August 12, 1959, the validity of which is the subject of the present contest. As of this writing, it is difficult to determine whether the family stipulation and agreement is still in effect.

The crux of the present dispute is the contention that a will executed by decedent four days before his death, leaving his entire estate to his three sons, was fraudulently suppressed by the beneficiaries under the previous wills. This crucial phase of the controversy was not sufficiently stressed by the contestants in their oral arguments or in the briefs which were furnished to the court by them.

Moreover, we regard as one of the most serious impediments to a proper disposition of this case the fact that, in spite of the dubious conduct and character of the parties to this ugly controversy, and the long delay in revealing the making of the alleged will which it is charged was lost or suppressed, none of the judges of this court has seen or heard the witnesses upon whom the contestants rely. Moreover, it should also be noted that none of the parties charged with the suppression of the alleged lost will testified at any point in these

proceedings. The demeanor of the witnesses on the stand and the impressions they make upon a hearing judge could be of the utmost importance in measuring their credibility and reaching a conclusion with respect to the truth or falsity of the contestants' charges.

The register of wills, having accepted for probate the will of September 16, 1958, as republished by the holographic will of April 21, 1959, may have exceeded his authority when he issued the citation to compel the alleged lost will to be deposited with him. However, any procedural errors now become unimportant as the matter is properly before us on appeal from probate and we are authorized under the provisions of the Orphans' Court Act to hear the testimony *de novo* and to determine which of the alleged writings of testator is his last, valid and effective will. In any event, under Supreme Court Orphans' Court Rule, section 2, rule 1 (Philadelphia Orphans' Court Rule 21): ". . . The court at every stage of any action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties in interest." A majority of the court is of the opinion that the ends of justice require that the contest be heard *de novo* by a judge of this court, who, after taking the necessary steps to correct the defects in this record and making certain that all necessary parties have been joined in this litigation, shall impanel a jury to decide questions of fact in accordance with the provisions of section 745 (c) of the Orphans' Court Act of 1951, as amended by the Act of July 14, 1961, P. L. 610.

We, therefore, enter the following

*Decree*

And now, February 21, 1963, the exceptions are dismissed *pro forma* and the president judge will refer the matter to a hearing judge, who shall proceed in accordance with this opinion.

*Concurring Opinion*

BOLGER, J. February 21, 1963.—While I concur in the result of the majority opinion, I do not agree with the reasons which a reading of this record reveal.

The exceptions in this case are filed by three sons of decedent, hereafter called contestants, who object to an opinion and decree dismissing an appeal from probate of an alleged last will dated April 21, 1959, and a codicil dated April 21, 1959.

The probated papers give the entire estate to testator's two sisters, Nettie Wilf and Jennie Jastrow, and to his two brothers, Morris and Samuel Banks. These parties will hereafter be referred to as proponents. The codicil cut off his wife and three sons with gifts of one dollar to each.

The contestants aver that there was a later will dated August 12, 1959, which was not produced, in which testator gave his entire estate to his three sons in equal shares and named one of them executor.

The will and codicil were probated October 22, 1959, after a caveat had been filed and withdrawn by the three sons. Later, the contestants petitioned the register of wills for a citation directed to the beneficiaries to show cause why the will dated August 12, 1959, which was alleged to be in the possession of Jennie Jastrow and by her fraudulently suppressed, should not be produced for probate. A responsive answer was filed denying knowledge, possession and suppression of the alleged will.

The register then proceeded to hold several hearings and on January 31, 1961, upon motion of counsel for the proponents, dismissed the petition by a decree without an opinion. Subsequently, a petition for citation was allowed by this court on June 8, 1961, *to show cause why the decree of probate of the will dated April 21, 1959, should not be opened and the later alleged will ad-*

*mitted.* Preliminary objections to the petition were dismissed and an answer on the merits were filed. On February 26, 1962, the president judge assigned the case to Saylor, J., for trial.

At the time fixed for the hearing, counsel for both sides requested the hearing judge to determine the dispute on the basis of testimony presented to the register and depositions which had been taken in Atlantic City with reference to a collateral equity action pending in the Common Pleas Court of Philadelphia County. None of the proponents testified before the register or by depositions, or before the trial court. The hearing judge agreed to decide the case on the basis of the testimony, filed an opinion and entered the following

### Decree

"And now, June 27, 1962, the appeal from the decree of the Register of Wills dismissing the petition to show cause why an alleged later will should not be produced for probate is hereby dismissed, and the record of probate is remanded to the Register of Wills. Saylor, J."

The exceptions to his opinion and decree aver, inter alia, that the hearing judge failed to find there was adequate proof of the lost will; that he failed to consider the fraudulent suppression of the alleged will and that he erred in dismissing the appeal.

There are procedural errors here which require comment and decision. The proceedings before the register, once his decree of probate had been entered, were a nullity. He mistakenly allowed the citation under section 307 of the Register of Wills Act of June 28, 1951, P. L. 638, which reads as follows: "The register, at the request of any party in interest, shall issue a citation to any person alleged to have possession or control of a will of a decedent requiring him to show cause why it should not be deposited with him. In the absence of good cause shown, the register shall order the will to be

deposited with him." It is patterned after section 8 of the Register of Wills Act of June 7, 1917, P. L. 415.

Under section 307 of the Act of 1951, supra, it is obvious that the register could issue the citation if he had erroneously issued letters of administration or if there had been no decree of probate. He could not properly hold a hearing under the present law if a responsive answer to the petition were filed. The Register of Wills Act does not authorize him to conduct a hearing or render a decision. Once the register entered a decree of probate, as here, he exhausted all of his jurisdiction and the only procedure possible was by appeal from that decree to this court. "With the probate of a will the judicial powers of the Register of Wills cease, and all questions thereafter touching the probate or validity of a will are to be determined by the Orphan's Court on appeal . . .": Hunter's Pa. O. C. Commonplace Book (2d ed), vol. 5, p. 165, §5(a). See also Sebik's Estate, 300 Pa. 45 (1930); Cochran v. Young, 104 Pa. 333, 336; Zeigler v. Storey, 220 Pa. 471; Mathews v. Biddell, 8 Pa. Superior Ct. 112. When such appeal is taken, the issue before the court is simply the determination of the fact whether the later writing, prima facie, is a will. If the court finds that a prima facie case exists, it enters an order opening the decree of probate and sends the record back to the register for his attention. This is because this court has no original jurisdiction of the probate of wills. Only the register can initially determine whether a will can be admitted to probate unless he certifies the record to this court or an appeal is taken from his decision: Hunter's Pa. O. C. Commonplace Book (2d ed.) vol. 5, p. 165, § 5(b) and Partridge-Remick Pa. O. C. Practice, vol. 1, p. 91, §3.12 (b); Crawford v. Schooley, 217 Pa. 429. Such an order is interlocutory: Murray Will, 404 Pa. 120 (1961). The hearing judge was, therefore, without jurisdiction to hear and determine the case sitting as judge and jury.

Some doubt may have been cast upon this procedure by the decision in Roberts Will, 373 Pa. 7. Upon appeal from the register's decree of probate of an earlier will, the orphans' court there took jurisdiction to determine the validity of a later will. The orphans' court, without making a finding of a prima facie case and returning the record to the register, proceeded to conduct a d. v. n. proceeding and a jury trial which sustained the later will. The trial judge approved the verdict and entered an order directing the register to open his decree of probate and admit the later will to probate. The Supreme Court affirmed holding, inter alia, that the procedure was correct, citing Sebik's Estate, supra, without referring to the line of cases outlined above.

Roberts Will cannot be regarded as binding on this point because of its reliance on Sebik's Estate where the issue was different. In Sebik's Estate, the appeal was from the refusal of the register to admit the later writing to probate, after his original decree had been entered for more than two years and the statute of limitations had expired. The Supreme Court upheld the lower court, but did not specify what procedure it should follow. It merely stated: The orphans' court "will take evidence to enable it to determine the issues involved and make an appropriate order so that it may be probated accordingly, if sustained." However, Sebik's Estate, at page 250, correctly cited Mathews v. Biddell as follows: "With the probate of the will the register's judicial powers ceased; . . . all questions thereafter touching the probate or the validity of the will are to be determined by the orphans' court, on appeal from the register's decision, where the proper issue may be framed." There was no averment of fraud. The register's decision was affirmed by both the orphans' court and the Supreme Court. It is my opinion that only the register of wills has the authority to admit a later will to probate unless he has surrendered this

right by certifying the record to this Court or unless an appeal has been taken from his decree. We have the right and the duty on our own motion to raise the question of our jurisdiction: Thomas v. Johnson, 356 Pa. 570. Consent of the parties cannot give this court jurisdiction to declare the rights of parties as to which we have no jurisdiction: Hunter's Pa. O. C. Commonplace Book (2d ed.) vol. 4, p. 375, §10(b).

Although the proceedings before the register were improper, nevertheless the testimony heard by him and the depositions by stipulation of the parties in interest, were properly admitted in evidence. They satisfied the basic requirements of the law pertaining to the admission of testimony taken in other cases. Both sides agreed by their oral stipulation that each had had an equal opportunity to cross examine all of the witnesses: Haupt v. Henninger, 37 Pa. 138 (1860). The hearing judge accepted the testimony in accordance with section 744 of the Orphans' Court Act of August 10, 1951, P. L. 1163. Implicit in the oral stipulation of counsel was the waiver of a d. v. n. proceeding. The case was submitted to the judge to determine the dispute: section 746(a.1) of the Orphans' Court Act of 1951, as amended by the Act of February 10, 1956, P. L. 1022.

The testimony concerns itself with two main events, the alleged execution of a will dated August 12, 1959, and on August 16 possession of the said will by two of the proponents, and the presumption of revocation. The opinion concerns itself with only one phase of the case. The hearing judge found as a matter of law that the probated will and codicil had not been revoked under section 5 of the Wills Act of April 24, 1947, P. L. 89, and that there was no evidence sufficient to prove the alleged lost will. He gave no consideration to the events of August 16, nor did he make any findings of fact in connection therewith. He failed to rule upon the possibility that the lost will had been revoked by testator and

the consequences which would flow from such a revocation. These are fundamental errors.

Since the hearing judge did not see or hear the witnesses, whose credibility he could not competently pass upon, but decided the case on the basis of testimony submitted, it is now our duty in passing upon the exceptions to make our own findings of fact and inferences from "the cold print": Jordan's Estate, 310 Pa. 401; Gilbraith's Estate, 270 Pa. 288; Mirkil v. Morgan, 134 Pa. 144. We are not concerned with whether the hearing judge, after receiving testimony in court and having the opportunity to see and hear the witnesses, was arbitrary and capricious in his treatment of the testimony or manifestly abused his discretion: Hanna Estate, 383 Pa. 196; Collings Estate, 405 Pa. 280.

Although it was manifest error for the hearing judge and for the register to have full dress hearings, it would be unnecessary circuity of action to refer this case back to the register stating that we now consider a prima facie case to have been established and direct him to have hearings, if necessary, to determine whether he would enter a new decree admitting the will of August 12, 1959. We can assume that he would immediately certify his record back to this court because of the substantial dispute of material facts. *The case is properly before us on appeal.* The court has the legal and equitable powers to make a dispositon of the dispute as the demands of justice require: Freihofer Estate, 405 Pa. 165. We also have the right to invoke Rule 21 of the Orphans' Court Supreme Court Rules, which reads as follows:

"The rules adopted by the Supreme Court regulating the practice and procedure of the Orphans' Court of this Commonwealth, and the rules adopted by such courts, shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court

at every stage of any action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties in interest."

I would find that the application of this rule and the waiver of all errors of procedure will not affect the rights of the parties in interest and I, therefore, waive all such errors of procedure.

After a thorough study of all of the testimony and the record in this case, I summarize the testimony as follows: Decedent, Harry Banks, was estranged from his wife. In September, 1958, a professionally-drawn will was prepared. It was dated in type September 16, 1958, which date was cancelled and in lieu thereof the date, April 21, 1959, was inserted, and the will was executed by Harry Banks. On April 21, 1959, he also executed a holographic codicil wherein he excoriated his wife and gave her and each of his children one dollar. At the time of his death and for several months prior thereto, he owned, operated and resided in an apartment house in Atlantic City. This house had two wings. In one of the wings there was a kitchen and a dining room for the common use of all tenants. Access to the dining room was either by the front entrance or by a side door. Decedent lived in another wing remote from this dining room.

In July of 1959, Mrs. Tillie Cornfield, a widow, and her mother became tenants of a first floor apartment adjacent to the dining room. She became quite friendly with testator and assisted him in managing the apartment. Their friendship ultimately resulted in a proposal by him of marriage as soon as he could arrange for a divorce from his wife who lived in Philadelphia. On August 12, 1959, testator told Tillie Cornfield that he proposed to drive to Philadelphia to remove his will from a safe deposit box and destroy it. On August 12, 1959, in the presence of Tillie Cornfield, testator wrote a holographic will stating it was his will. He signed it

in her presence, asked her to sign as a witness and to read it, which she did. She testified that the will gave everything in equal shares to his three sons and named his oldest son executor. After she had read it, Tillie Cornfield stapled the two sheets of paper, folded them and placed them in a cardboard box which was on a buffet in the dining room. This box, described as being about the size of a cardboard shirt box, contained many other papers such as receipted bills, blank receipts for acknowledging payment from tenants and, to the best of the witness's recollection, always remained in the same place.

Stanley Britto was a casual employe of testator and assisted him as janitor, painter and handyman. On the morning of August 12, he was present on the premises and testator called him into the dining room, showed him the papers and said to him that he had just written his will and asked him to witness the signature, which was already on the paper. Britto did not read the will, but testator told him that by his will he was giving everything to his three sons and naming one of them "the beneficial". He then informed Britto that he proposed to go to Philadelphia the next day with Tillie Cornfield to destroy his other will which was in a safe deposit box. After executing the will, he told the witnesses that he felt much better.

Very early the next morning, testator had a severe heart seizure, was taken to a hospital and died three days later without ever having returned to the apartment. During this time, Tillie Cornfield spent a great deal of the time visiting him in the hospital, whereas Britto spent more time at the apartment and helped with the management. During this time and prior to testator's death, both Britto and Mrs. Cornfield had, at different times, occasion to go to the cardboard box for the purpose of getting blank receipts to acknowledge payments received from new tenants, at which times

both stated that they saw the will in the box. There were no visitors to the dining room on the night preceding testator's death.

At about 8:00 a.m. on August 16 and when she learned of testator's death, Tillie Cornfield visited the home of one of his sisters nearby. At about 10:00 a.m., she returned to the apartment, accompanied by the two sisters and their spouses. The latter proceeded to move furniture and personal belongings from the apartment which Banks had occupied and proceeded to ransack the dining room, demanding of Tillie Cornfield that she disclose the location of all his records. Tillie protested stating that all such items belonged to his sons.

At about noon, testator's three sons and his wife came to the apartment. There was a large crowd when they arrived. Although they entered the foyer, they were barred by the sisters and their spouses from entering the dining room. Daniel Banks, one of the children, went to summon the police. The police had already received a complaint concerning the disturbance and were approaching the apartment as Daniel was searching for them. According to Britto, as the Banks were endeavoring to gain entrance to the dining room by the front door, Mrs. Jastrow went out the rear or side door carrying with her the box which was handed to her by Mrs. Cornfield and which contained the will. She returned shortly and joined her husband, sister and brother-in-law when or after the police arrived. After about five or ten minutes, the police ascertained the relationships of the parties to decedent and requested the sisters and their husbands to leave the premises. The police escorted them from the building and as this occurred, both the sisters requested that the police search them and voluntarily opened their purses for inspection to prove that they had no papers.

After the sisters departed, the Banks family entered the dining room and, after some time of conversa-

tion, were served coffee and cake by Tillie. Later in the afternoon, one of the tenants of the apartment informed Daniel Banks that on that very morning several items, which had been in the room occupied by decedent, were removed and placed in the rooms occupied by Tillie and her mother. He then demanded that Tillie turn such property over to him and his family. Tillie told him that the sisters and their husbands had taken everything and had stripped her clean. The son thereupon went to detective headquarters and obtained a warrant which resulted in Tillie's arrest. No one appeared to testify against her and the case was dropped. Later that same night, Tillie visited the home of one of the sisters and gave her a "bundle of papers" which she had found under the pillow on a bed in the room which she occupied with her mother. She did not examine the contents of this bundle. The next morning she surrendered the apartment and returned to Reading, Pennsylvania. On the next day, Tuesday, August 18, the sisters came to Philadelphia and had testator's safe deposit box drilled to search for his will.

Several months later, Daniel Banks went to Atlantic City and spoke with Britto who suggested that he contact Tillie at Reading. On this occasion, Britto made no disclosure concerning the will of August 12. After having visited Tillie, Daniel again visited Britto in Atlantic City and for the first time learned from him that there was a later will. He returned to Reading and Tillie confirmed Britto's statement in all essential details. She later visited the office of the contestants' counsel in Philadelphia accompanied by her personal attorney. In his presence and in hers, counsel for the contestants dictated a detailed statement of the facts of which Tillie had personal knowledge. She refused to sign the transcript when the statement had been typed and gave as her reason the fact that she wanted to be "protected" by receiving $5,000, which allegedly was

in the safe deposit box of testator and which Tillie said decedent planned to put into a joint savings account in her name and his.

When the depositions were taken in Atlantic City, a Mrs. Cohen, who was related to Tillie's mother, was called by the proponents. Her testimony shed little light on the occurrences which took place on Sunday, August 16. At best, her testimony must be considered negative. On the same day, Britto, as a witness for the proponents, was called to testify. He acknowledged that he had served a five year prison sentence, having been convicted of burglary.

The depositions taken in Atlantic City were not presented to the register of wills.

In view of Britto's criminal record, his credibility is for the trier of the fact. He certainly is not incompetent to testify: Commonwealth v. Varano, 258 Pa. 442 (1917). He was offered as a witness by the proponents and his testimony was presented by them to the hearing judge. They will, therefore, find it difficult to impeach his testimony.

Tillie Cornfield, as a witness, was devious and either corrupt or bewildered. Her testimony is characterized by half or complete lies which on cross examination turned to full truths. To cite one of many instances, she stated that Britto did no work for decedent for two weeks prior to the date of his death, but later admitted that he did. She was plainly biased, but that bias is on many points clearly in favor of the respondents, some of whom she knew prior to decedent's death. At several points in her examination, counsel for contestants pleaded surprise and was permitted to cross examine her upon the basis of a statement given to him in Philadelphia. She admitted variations in her testimony from that given on the witness stand, but denied many others. A stenographer, who had taken the interview, read from her notes which revealed a much stronger

case for the contestants than Tillie told before the register and closer to that revealed by Britto.

The truth or falsity of the foregoing testimony is also of necessity for the fact finding body: 1 Laub Penna. Trial Guide, page 352, §173.6, Falsus in Uno, Falsus in Omnibus. The proper way to charge the jury on this maxim is stated to be "that if a witness wilfully and corruptly swears falsely to any material fact in the case, the jury are at liberty to disregard the whole of his testimony". Some judges add the qualification that the jury should not disregard that portion of the witness's testimony which is corroborated by other credible evidence. It should be noted that the maxim does not forbid the jury from accepting the whole of the witness's testimony even though they find deliberate falsification of his proofs in a material respect. The doctrine gives the jury the liberty of disregarding all of it—it is not a mandate to disregard it: Western Show Company, Inc. v. Mix, 315 Pa. 139, 143.

As noted above, none of the proponents, although some of them were present at the hearings, took the witness stand to deny any of the contestants' testimony. A fact finder would, therefore, be free to infer that their failure to take the stand was because any testimony they might give would not be favorable to them: Peters v. Shear, 351 Pa. 521.

The foregoing testimony relates to two phases of a lost will or other writing—its execution and its fraudulent suppression. The necessary quantum of proof differs in each instance. There is no authority in any of our wills acts specifically authorizing the probate of a lost will or any other effect to be given such a document. Section 2 thereof merely requires proof by two "competent" witnesses of a written testamentary instrument. The authority establishing the validity of such an instrument is strictly judicial and is of long standing. In Foster's Appeal, 87 Pa. 67, 76 (1878),

Justice. Agnew stated: "But such a will having a legal existence, yet accidentally lost or destroyed, the establishment of its contents is not the making of a new will, but a restoration merely of that which the testator himself made and left behind him to govern his estate. There is no greater sanctity, in this respect, than the restoration by parol evidence of other instruments equally solemn and having an equal effect in disposition of property. . . ."

The requirements of the proof of a lost will are well stated in Hock v. Hock, 6 S. & R. 47: Proof of a lost will is made out only by proof of execution and of contents by two witnesses, each of whom must separately depose to all the facts necessary to complete the chain of evidence so that no link in it may depend on the credibility of but one.

The classic case for the establishment of a lost will and one which has been cited frequently with approval is Glockner v. Glockner, 263 Pa. 393 (1919), where testator who was possessed of a considerable estate showed each of two witnesses separately and at different times a small book in which he had written his will, but which was subsequently lost. Both witnesses were familiar with his handwriting, read the will and agreed as to its contents. Decedent had also made statements to others consistent with the dispositions in the lost will. The court sustained a jury's verdict for the will and also held that the presumption of revocation by testator set forth in Fallon's Estate, 214 Pa. 584, was overcome in that testator was stricken on the morning after the will was last seen by one of the witnesses and testator died a few days later.

Because of its overall importance in the determination of the case, I will first deal with the question of the fraudulent suppression of the will of August 12, 1959, and the quantum of proof necessary to establish that conclusion.

In Gardner's Estate, Gardner's Appeal, 164 Pa. 420, 426, the court stated: "The theory of proponents being that of concealment or destruction, the latitude of proof must have been necessarily wide. Fraud is rarely capable of proof in a direct way. 'It is the chain of less direct circumstances, all pointing in the same way until there seems no other reasonable mode of reconciling them, that must usually be depended on in reaching a conclusion': Eichenlaub v. Hall, 163 Pa. 201. The issue demanded here was whether or not there had been a revocation of the will of Lot Gardner, and was of right unless the whole evidence of the fact alleged was so doubtful and unsatisfactory that a verdict in favor of the validity of the will would not be permitted to stand. The question was one of sufficiency of evidence." The court pointed to the suspicious conduct of those who surrounded testator and whose interests would be served by the destruction of the later will. In Gfeller v. Lappe, 208 Pa. 48, 50, a verdict in favor of a lost will was sustained. The jury found in favor of the proponents despite testimony of one witness who advised that testator told him he had destroyed the will and showed him fragments of it. The court said at page 50: "The testimony took a wide range, but necessarily so, since the allegation was that of fraud, and in the issue tried the decedent's acts and declarations, and the conduct of the interested parties around him were legitimate subjects of inquiry." Citing Youndt v. Youndt, 3 Grant 140, and Gardner's Appeal, supra.

In Hunter's Pa. O. C. Commonplace Book, (2d ed.) vol. 4, p. 308, §2: "Where a will is destroyed by fraud, strict proof of its execution and contents is not required: See Jones v. Murphy, 8 W. & S. 275; Pare's Est., 53 Pitts. 235, 15 Dist. 553."

A review of the foregoing testimony concerning fraudulent suppression of the will would prompt me to let stand a fact finder's conclusion that:

(a) Testator was completely estranged from his wife.

(b) That on April 21, 1959, he made a will cutting off his three sons, but stated in the codicil "God bless my children".

(c) In July, 1959, he met Tillie Cornfield, whom he hoped to marry.

(d) His attitude toward his children changed and he declared his intention to right the wrong he had done them in disinheriting them.

(e) He expressed his intention to revoke his existing will by destroying it and by executing the will of August 12, 1959.

(f) That two competent witnesses testified to his execution of a holographic will dated August 12, 1959.

(g) That this will did not remain in his exclusive possession nor was he in possession of it at the time of his death and was, therefore, unrevoked.

(h) On August 16, 1959, that Jennie Jastrow and her sister, beneficiaries under the probated will, purloined testator's will of August 12, 1959, and that they are now suppressing it or have spoliated or destroyed it.

If the testimony pertaining to the actions of testator's sisters and their husbands within a few hours after the death of testator be true, their conduct was nothing short of ghoulish. A jury would be justified in finding active fraud by the beneficiaries and the court could invoke an English doctrine which might be called odium spoliatoris. Under this doctrine, if it is proved that there was a later will executed by testator and unrevoked at the time of his death and is fraudulently suppressed by the beneficiaries of an earlier will, *proof of its contents will not be required* because the law will infer that the provisions of the missing will were unfavorable to the suppressors and therefore that the earlier will was revoked: Jones v. Murphy, 8 W. & S. 275 (1844). The court held there

that the proof of the factum of a later will under such circumstances is in law a will; that it is preferable to declare testator died intestate than to permit malefactors to profit from their own villany. The evidence in the present case is strikingly similar to that in the cited case not only on the law as above stated, but also as to the question of revocation of the lost will, and the rulings of the trial judge, which the Supreme Court reversed, are comparable to those made in this case.

In addition to the issue of fraud, there is grave doubt whether the testimony of the execution of the lost will is not sufficient to establish not only the revocation of the probated will, but also of a dispositive probatable will.

The hearing judge cited section 5 of the Wills Act of 1947, which provides in part as follows: "No will or codicil in writing, or any part thereof, can be revoked . . . otherwise than: (1) By some other will or codicil in writing, (2) By some other writing declaring the same, executed and proved in the manner required of wills. . . ."

He then cited Harrison's Estate, 316 Pa. 15, 20: "Hence the statute requires that the revocation must be by a writing and it may be that this means by a writing which is produced." He then found that since no will could be produced (physically) citing Koehler's Estate, 316 Pa. 321, 323 (1934): " 'It cannot be shown by oral testimony alone that a will has been revoked. A writing declaring its revocation must be produced, signed by the decedent, before an earlier will can be rendered nugatory.' "

I seriously question the applicability of these decisions to this case because they completely ignore the cases establishing the deeply entrenched doctrine of lost wills enunciated in Glockner v. Glockner, supra; Foster's Appeal, 87 Pa. 67; Youndt v. Youndt, supra; Gardner Estate, supra, which cases are not cited or

discussed in the Harrison and Koehler cases. These cases hold not only that a later will can revoke an earlier will, but that if the later will is lost, upon sufficient proof the decree of probate of the earlier will will be opened and the later writing, although not produced, will be admitted to probate. These cases have been cited with approval as late as Murray Will, supra. It also appears from the dissenting opinions in Burtt Will, 353 Pa. 217 (1945), that Burtt Will overruled Harrison and Koehler. In Burtt Will, a later will than that which was probated was cancelled by testator by his obliterating his signature. The paper itself remained in existence and although it could not be probated, it was accepted as proof of revocation of the earlier will. Testator's statement of his intentions made at the time of the cancelling of his signature were admitted and given great weight as res gestae. Burtt Will and many of the cited cases, all of which are reviewed in Mr. Justice Allen M. Stearne's opinion, were involved with the problem not only of proof of revocation, but also the effect of such revocation in cases where the later writing itself was revoked. We are not concerned with the problem of revival of the probated will here because section 6 of the Wills Act of 1947 provides as follows: "If, after the making of any will, the testator shall execute a later will which expressly or by necessary implication revokes the earlier will, the revocation of the later will shall not revive the earlier will, unless the revocation is in writing and declares the intention of the testator to revive the earlier will, or unless, after such revocation, the earlier will shall be re-executed. Oral republication of itself shall be ineffective to revive a will." No proof of republication of the probated will exists here. Therefore, it is unnecessary to determine for this purpose whether the will of August 12, 1959, was revoked, lost or suppressed.

Had Britto read the will and the testimony of the witnesses been accepted, the contestants' case would clearly be proved under Glockner v. Glockner, supra. The question then arises as to whether testator's statement to Britto as to contents is res gestae and supplies the only link missing in the proof of the lost will by two witnesses although Britto did not read the will. There is much to support this conclusion.

In Hock v. Hock, supra, only one witness read the contents of the will and was able to prove execution. The other witness did not know the contents. The court stated by way of dictum (p. 48) : "If the testator, in his conversation with Rodernel [the second witness], had mentioned the substance of the contents of his will . . . there would have been at least a circumstance to leave to the jury, for the purpose of connecting his declarations with the paper in question . . ."

In Eyster v. Young, 3 Yeates 511, 515, the court said : "We hold moreover, that circumstances may supply the want of one witness, where they directly go to the immediate act of disposition." In Burtt Will, supra, the case of Flintham v. Bradford, 10 Pa. 82, is cited with approval concerning the great weight to be given by the fact finder of statements made by testator contemporaneous with revocation as part of the res gestae. In 1 Henry Pa. Evidence, 4th Ed., §466, p. 461, res gestae is stated to be positive testimony.

If this testimony be accepted and the legal conclusions are that testator's contemporaneous statement as to contents be sufficient to supply the missing link in the proof by two witnesses of the lost will, the fact that the contents of the lost will are inconsistent with those of the probated will would result in a decree revoking the probated will with a resultant intestacy or that the lost will is a dispositive probatable will.

I would not now decide the legal issues raised herein because there is to be a new trial before a jury. The

solution of these issues lies within the province of the judge presiding at the new trial. However, I would find that the testimony establishes a prima facie case that testator executed a will on August 12, 1959, and that a substantial dispute exists concerning the validity of that will as well as of the probated will and codicil of April 21, 1959.

In the interests of justice and because the trial of this case was held in large part upon misunderstood issues and the determination of the facts depends upon the credibility of the witnesses whom the fact finder should see and hear, the court should exercise its power to order a new trial sua sponte: Fisher, Executor v. Brick, 358 Pa. 260; Potanko v. Sears, Roebuck & Company, 368 Pa. 582. In conjunction therewith, it should also exercise the power reposed in it under section 746 (a. 1) Orphans' Court Act of 1951, as amended, and direct that the trial of this case be held by a judge and jury.

The record indicates that one of the contestants is a minor and that testator's widow is not a party of record. Since this is a proceeding in rem, these defects should be corrected before proceeding further: Miller's Estate, 159 Pa. 562; 166 Pa. 97; Thomas Will, 349 Pa. 212; Cohen Will, 356 Pa. 161.

The issues to be tried should now be framed and, therefore, I would enter the following

### Decree

And now, February 21, 1963, a new trial of this case is ordered, to be tried by a judge designated by the president judge, who is directed to empanel a jury and proceed de novum to hear and determine the following issues:

1. Did Harry Banks, testator, execute a will on August 12, 1959?

2. If it is found that he did, did said will revoke the will and codicil of April 21, 1959?

3. Did he execute a will on August 12, 1959, disposing of his estate to his three sons and appointing one of them executor?

4. Did he revoke that will before he died?

5. Was the said will fraudulently suppressed by one or more of the beneficiaries under the probated will of April 21, 1959?